## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CCP SYSTEMS AG,<br><br>                    Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CORP., LTD.,<br>SAMSUNG ELECTRONICS AMERICA, INC.,<br>SAMSUNG NETWORKS, INC.<br>and IBM CORPORATION,<br><br>                    Defendants. | Civil Action No:<br><br>Jury Trial Demanded |

### VERIFIED COMPLAINT FOR COPYRIGHT AND PATENT INFRINGEMENT

CCP Systems AG ("CCP") for its Verified Complaint against Samsung Electronics Corp., Ltd. ("Samsung ECL"), Samsung Electronics America, Inc. ("Samsung America"), Samsung Networks, Inc. ("Samsung Networks"), and IBM Corp. ("IBM") (collectively, "Defendants"), states as follows:

### PARTIES

1.      CCP is a corporation organized and existing under the laws of Germany with its principal place of business at Stammheimer Str. 35, 70435 Stuttgart, Germany.

2.      Upon information and belief, Defendant Samsung ECL is a corporation organized and existing under the laws of South Korea, with its principal place of business at Samsung Main Bldg. 250, 2-Ga, Taepyung-Ro Joong-Gu, Seoul, Korea, 100742.

3.      Upon information and belief, Defendant Samsung America is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey, 07660.

4.     Upon information and belief, Defendant Samsung Networks is a corporation organized and existing under the laws of South Korea, with its principal place of business at 9th Floor, Asem Tower, Samseong 1(il)-Dong , Gangnam-Gu Seoul, Korea, 135798.

5.     Upon information and belief, Defendant IBM is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1 New Orchard Road, Armonk, NY 10504.

## JURISDICTION AND VENUE

6.     This is an action for copyright infringement under the Copyright Act, 17 U.S.C. § 106, and for patent infringement under the Patent Act, 35 U.S.C. §§ 271 and 281-285.

7.     This Court has subject matter jurisdiction over the Federal law claims in this case pursuant to 28 U.S.C. §§ 1331 and 1338(a)-(b).

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 because the Defendants may be found in this District, do substantial business in this District, and have engaged in acts of copyright and patent infringement in this District.

9.     This Court has personal jurisdiction over Defendant Samsung America because New Jersey is Samsung America's principal place of business.

10.     This Court has personal jurisdiction over Defendant IBM by virtue of IBM's transacting business within this State, and because of its systematic and continuous contacts with residents of this State.

11.     This Court has personal jurisdiction over Defendants Samsung ECL and Samsung Networks by reason of those Defendants transacting business within this State and committing wrongful acts within this State, and by virtue of their systematic contacts with residents of this State.

- 2 -

12.     In particular, this Court has personal jurisdiction over Defendants Samsung ECL and Samsung Networks because they operate and maintain interactive websites which can be accessed, and, upon information and belief, have been accessed, by residents of this State.

## FACTS COMMON TO ALL CLAIMS

### A.      CCP's Software Products

13.     CCP designs, develops, manufactures, sells and distributes software for use in connection with computer printers and other computer-related devices.

14.     In particular, and relevant to this action, CCP developed software called "JScribe®," which is an open application and communication platform for servers, workstations, multi-function printers, and standard printers, allowing those devices to exchange information proactively in every direction.

15.     The JScribe software has been the basis for many additional programs and variations. CCP has designed and developed those additional programs and variations into several applications, including the following:

a.  "JScribe Core," which is the version of JScribe for embedding on individual printers, multi-function printers, and other devices.

b.  "JScribe Mobile Print Solution" ("JMPS"), which is a JScribe-based client/server solution for mobile printing in company and public networks.

c.  "JScribe Software Developer Kit" ("JSDK"), which is a JScribe-based integrated development environment for the development of JScribe applications.

d.  "JISS OpenPower," which stands for "JScribe Intelligence Server Solution OpenPower," which is a server-based solution for tracking print and managing related costs, implemented on Linux/Unix platforms according to requirements defined by IBM.

- 3 -

f. "JTalk" is a JScribe-based tool for deploying JScribe applications to printers and other devices with JScribe Core or the JScribe Application Server Solution ("JASS") embedded.

g. "KYAOC" is a custom derivative of JMPS developed by CCP for a specific client, the State of Kentucky Administrative Office of Courts.

(The JISS OpenPower, JMPS, JSDK, JScribe Core, JTalk and KYAOC software are referenced collectively throughout this Complaint as the "CCP Software.")

**B.    The Limited Licenses Granted to Defendants by CCP**

16.    In 2004, CCP signed a contract with IBM Deutschland GmbH ("IBM Germany") (the "IBM Germany Agreement"), under which, *inter alia*, (a) CCP would license and deliver copies of JScribe Core to IBM Germany, and (b) IBM Germany then would sublicense and deliver copies of the JScribe Core software to its customers, solely to be bundled with other software in the customer's "Firmware" and embedded into the customer's device, such as a printer. ("Firmware" is a microprogram stored in ROM [read-only-memory], designed to implement a function that had previously been provided in software.) Under the IBM Germany Agreement, no other uses of the JScribe Core software were permitted by IBM Germany or its customers.

17.    Upon information and belief, Samsung ECL, under a written sublicense agreement with IBM Korea (IBM Germany's Korean sister company, which, upon information and belief, has a sublicense arrangement with IBM Germany), embedded the JScribe Core software with other software of Samsung ECL, creating "Firmware," which it would then in turn embed directly into a Samsung-brand device, such as a printer.

18.    According to the IBM Germany Agreement, as an IBM customer with an authorized sublicense, Samsung ECL, for itself and through its affiliates, such as Samsung America, could distribute devices containing the Firmware (which included the JScribe Core) to consumers in

- 4 -

the United States and elsewhere. Samsung would then pay a royalty to IBM Germany (or its sister company in Korea), who would then in turn pay a royalty to CCP for each device sold that incorporated the JScribe Core software.

19.     The IBM Germany Agreement did not provide that an IBM customer, such as Samsung ECL, could distribute the JScribe Core software (or any other CCP Software) apart from a device, or to make any CCP Software publicly available online.

**C.      The IBM Agreement is Terminated**

20.     The IBM Germany Agreement, as amended, allowed CCP to terminate that agreement without further notice if certain events transpired. In particular, the IBM Germany Agreement allowed CCP to terminate the Agreement if CCP and IBM Germany could not reach agreement as to CCP's proposed business relationship with a competitor of IBM Germany. Since CCP and IBM Germany were not able to reach resolution on a proposed relationship between CCP and Samsung (a competitor of IBM Germany), CCP, on May 25, 2009 (the "Termination Date"), sent notice to IBM Germany that as of the Termination Date, CCP was terminating the IBM Germany Agreement and the license to the CCP Software granted therein.

21.     Samsung ECL acknowledged the termination of the IBM Germany Agreement in an email dated July 15, 2009. In that email, Mr. Chin Yoon, the Vice President of Samsung ECL's Solution Business Group, instructed Samsung ECL personnel to refrain from marketing devices incorporating CCP Software, and notified them that the agreement under which the CCP Software was supplied to Samsung ECL had been cancelled.

22.     Although CCP terminated the IBM Germany Agreement and the license therein to CCP Software as of the Termination Date of May 25, 2009, the Defendants, without CCP's consent,

have continued to reproduce and publicly distribute the CCP software, both as stand-alone software (bundled into Firmware) and in devices.

23.     In addition, without CCP's consent, Samsung ECL, Samsung Networks, and Samsung America have placed the CCP Software, including the Firmware incorporating JScribe Core software, online at Samsung Network's website "downloadcenter.samsung.com" and "samsungprinter.info," available for free to the public.

## COUNT I - COPYRIGHT INFRINGEMENT: DEFENDANT SAMSUNG NETWORKS

24.     CCP incorporates the allegations of paragraphs 1 through 23 above as though fully set forth herein.

25.     Samsung Networks owns and operates the website samsung.com.  The samsung.com website has many sub-domains, including downloadcenter.samsung.com (the "Download Center Website").

26.     Any United States resident with an Internet connection can access the Download Center Website, so long as that person knows the URLs for the code files on that website; no password or other security key is required to access it.

27.     Samsung Networks has reproduced, publicly displayed, and, upon information and belief, publicly distributed the JScribe Core software on the Download Center Website, as part of the Firmware, and this conduct continues as of the date this Complaint was filed.

28.     Anyone, including New Jersey residents, can download the Firmware, incorporating the JScribe Core software, for free, from the Download Center Website, if the person has the URL links to the Firmware files on the Download Center Website.

29.     CCP did not authorize Samsung Networks or anyone else to make its JScribe Core software publicly available online.

21414822\V-1

30.     CCP developed the JScribe Core software over the course of ten years, and that software program is an original work of authorship.

31.     CCP has registered claims to copyrights in four versions of the JScribe Core software (JScribe Core v. 4.0, JScribe Core v. 4.1, JScribe Core v. 4.2, and JScribe Core v. 4.3) with the United States Copyright Office.  The Copyright Office has assigned registration number TXu-1-610-843 to the JScribe Core v 4.0 claim to copyright, registration number TXu-1-610-827 to the JScribe Core v 4.1 claim to copyright, registration number TXu-1-610-915 to the JScribe Core v 4.2 claim to copyright, and registration number TXu-1-610-918 to the JScribe Core v 4.3 claim to copyright.  These four versions will be referenced collectively throughout this Complaint as "JScribe Core."

32.     By reproducing and publicly displaying the JScribe Core software at the Download Center Website, and by publicly distributing it on that site, Samsung Networks has directly infringed CCP copyrights in the JScribe Core software.

33.     Samsung Networks knew that i) making the JScribe Core software available online, apart from devices, was not authorized under any agreement with CCP; and ii) in any event, as of May 25, 2009, all licenses to the JScribe Core software had terminated.  Therefore, Samsung Networks' making the JScribe Core software available online for free download constitutes a willful infringement of CCP's copyrights.

34.     CCP has suffered irreparable harm because of Samsung Networks' infringement of its copyrights in the JScribe Core software, and will continue to suffer irreparable harm in the future unless the Defendants are enjoined from infringing CCP's copyrights in the JScribe Core software.

35.     CCP has suffered damages as a result of Samsung Networks' infringing conduct.

21414822\V-1

WHEREFORE, CCP requests the following relief against Samsung Networks:

a)    an award of compensatory damages and disgorgement of any profits of Samsung Networks attributable to the infringement, along with prejudgment interests and costs;

b)    a preliminary and permanent injunction prohibiting Samsung Networks and its officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and all those controlled by or acting in concert with or in privity with any of them, from infringing CCP's copyrights in the JScribe Core software, specifically prohibiting Samsung Networks from i) making the JScribe Core software available on the Download Center Website, ii) displaying or distributing any links to the Download Center Website; and iii) otherwise reproducing, displaying, distributing or preparing derivatives of the CCP Software;

c)    a Court order requiring Samsung Networks to impound any infringing articles in its possession, custody, or control; and

d)    such other relief as this Court deems just and proper.

## COUNT II - CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT: DEFENDANTS SAMSUNG ECL AND SAMSUNG AMERICA

36.    CCP incorporates the allegations of paragraphs 1 through 35 above as though fully set forth herein.

37.    Samsung ECL owns and operates a website at the URL samsungelectronics.com. That website has many sub-domains, including the sub-domain ecms.samsungelectronics.com (the "Partner Site").

- 8 -

38.    Upon information and belief, Samsung ECL operates the Partner Site for the benefit of its dealers, developers and distributors worldwide, including in New Jersey.

39.    To access content on the Partner Site, one must be registered with Samsung ECL, and Samsung ECL must approve, each application for access to the Partner Site.

40.    Both before and after May 25, 2009, Samsung ECL made a spreadsheet available on the Partner Site.  That spreadsheet contains information about various Samsung ECL products, including the Firmware that incorporates CCP's JScribe Core software.

41.    That spreadsheet contains active hyperlinks to the Download Center Website.  When one clicks on a hyperlink in the spreadsheet, one is taken directly to a ZIP file on the Download Center Website, where one can freely access and download the Firmware containing CCP's JScribe Core software.

42.    The spreadsheet described in paragraphs 40 and 41 is downloadable and transferable. That is, anyone accessing that spreadsheet on the Partner Site can save that spreadsheet to his computer, copy it, attach it to an email, forward it to others, etc.

43.    Samsung America controlled the website samsungprinter.info (the "Samsung Printer Website").  The Samsung Printer Website was open to the public.

44.    Samsung America placed a spreadsheet similar to the one described in paragraphs 41 and 42 above on the Samsung Printer Website, containing links to the code files on the Download Center Website.

45.    No password or other security information was required to access the code files on the Download Center Website, so anyone with this spreadsheet could freely access the code files in the Download Center Website.

46.    The unauthorized availability of JScribe Core on the websites described above materially impacts the market for this software and CCP's ability to exploit its product.  As an example of the effect on the market for the Firmware, CCP discovered an inquiry on a developer chat website, "Fix Ya," attached as Exhibit A.  In that post, a web user asked whether anyone knew where to find the Firmware for a Samsung-brand printer with JScribe 4.0 embedded.  Another user replied, identifying himself as a developer, and stated that if the user could not acquire the Firmware on the samsung.com website, he would get the Firmware from the Partner Site and send it to him.  This example illustrates how Samsung ECL's, Samsung America's, and Samsung Networks' posting of the Firmware code files online has resulted in uncontrolled distribution of CCP's software products.

47.    By posting the spreadsheet containing links to the Download Center Website online at the Partner Site and the Samsung Printer Website, Samsung ECL and Samsung America were aware of and supervised, facilitated and induced the direct infringement by Samsung Networks alleged in Count I.  Further, by providing the means by which that infringement can occur, *inter alia*, Samsung ECL and Samsung America substantially participated in Samsung Networks' direct infringement.   Accordingly, Samsung ECL and Samsung America contributorily infringed CCP's copyrights in the JScribe Core software.

48.    In addition, by facilitating Samsung Networks' direct infringement, Samsung ECL and Samsung America garner goodwill with their partners, developers and distributors by making various products available on the Download Center Website and the Samsung Printer Website, and they also gain financial benefit by avoiding paying a royalty for use of the CCP Software.  Accordingly, Samsung ECL and Samsung America have vicariously infringed CCP's copyrights in the JScribe Core software through their supervision and control of Samsung Networks.

49.    CCP has suffered damages as a result of the infringing conduct of Samsung ECL and Samsung America.

50.    CCP has suffered irreparable harm because of Samsung ECL's and Samsung America's contributory and vicarious infringement of its copyrights in the JScribe Core software, and will continue to suffer irreparable harm in the future unless Samsung ECL and Samsung America are enjoined from infringing CCP's copyrights in the JScribe Core software.

WHEREFORE, CCP requests the following relief against Samsung ECL and Samsung America:

a)    an award of compensatory damages and disgorgement of any profits of Samsung ECL and Samsung America attributable to the infringement, along with prejudgment interests and costs;

b)    a preliminary and permanent injunction prohibiting Samsung ECL, Samsung America, and their officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and all those controlled by or acting in concert with or in privity with any of them from infringing CCP's copyrights in the JScribe Core software, specifically, prohibiting Samsung ECL and Samsung America from i) making the JScribe Core software available on the Download Center Website, ii) displaying or distributing any links to the Download Center Website; and iii) otherwise reproducing, displaying, distributing or preparing derivatives of the CCP Software;

c)    a permanent injunction prohibiting Samsung ECL, Samsung America, and their officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and

- 11 -

all those controlled by or acting in concert with or in privity with any of them from infringing CCP's copyrights in the JScribe Core software, specifically, prohibiting Samsung ECL and Samsung America from i) making links to the CCP Software on the Download Center Website available on other websites such as the Samsung Printer Website, and ii) otherwise reproducing, displaying, distributing or preparing derivatives of the CCP Software;

d)    a Court order requiring Samsung ECL and Samsung America to impound any infringing articles in their possession, custody, or control; and

e)    such other relief as this Court deems just and proper.

## COUNT III - COPYRIGHT INFRINGEMENT (DIRECT, CONTRIBUTORY AND VICARIOUS): DEFENDANT SAMSUNG AMERICA

51.    CCP incorporates the allegations of paragraphs 1 through 50 as though fully set forth herein.

52.    CCP has registered a claim to copyright in the JMPS software with the United States Copyright Office. The Copyright Office has assigned registration number TXu-1-610-843 to the JMPS claim to copyright.

53.    CCP has registered a claim to copyright in the JSDK software with the United States Copyright Office. The Copyright Office has assigned registration number TXu-1-610-846 to the JSDK claim to copyright.

54.    CCP has registered a claim to copyright in the JTalk software with the United States Copyright Office. The Copyright Office has assigned registration number TXu-1-610-862 to the JMPS claim to copyright.

55.    CCP has registered a claim to copyright in the KYAOC software with the United States Copyright Office. The Copyright Office has assigned registration number TXu-1-610-844 to the JSDK claim to copyright.

56.    Upon knowledge and belief, Samsung America placed copies of the CCP Software, including JScribe Core, JMPS, JSDK, JTalk and KYAOC, on the Samsung Printer Website, available for free download. In particular, Samsung America placed source code files for KYAOC on the Samsung Printer Website without authorization.

57.    In addition, the Samsung Printer Website contained files with detailed instructions for how to use the CCP Software found on that website to install CCP Software onto hardware and other devices. These detailed instructions facilitated and encouraged unauthorized reproduction of the CCP Software by third parties, for which Samsung America garnered profit, thus, making those instructions available on the Samsung Printer Website constitutes contributory and vicarious infringement.

58.    CCP never consented to or authorized the reproduction and distribution of its software products on the Samsung Printer Website.

59.    CCP has suffered damages as a result of this infringing conduct.

60.    CCP has suffered irreparable harm because of Samsung America's infringement of its copyright in the CCP Software, and will continue to suffer irreparable harm in the future unless Samsung America are enjoined from infringing CCP's copyrights in the CCP Software.


WHEREFORE, CCP requests the following relief against Samsung America:

a)    an award of compensatory damages and disgorgement of any profits of the Defendants attributable to the infringement, along with prejudgment interests and costs;

- 13 -

b)    a permanent injunction prohibiting Defendant Samsung America and their officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and all those controlled by or acting in concert with or in privity with any of them, from infringing CCP's copyrights in the CCP Software, specifically, by prohibiting Defendants from reproducing and distributing the CCP Software on other websites, such as the Samsung Printer Website, and by otherwise reproducing, distributing, displaying or preparing derivatives of the CCP Software;

c)    a Court order requiring Samsung America to impound any infringing articles in its possession, custody, or control; and

d)    such other relief as this Court deems just and proper.

## COUNT IV - COPYRIGHT INFRINGEMENT: DEFENDANTS SAMSUNG ECL AND SAMSUNG AMERICA

61.    CCP incorporates the allegations of paragraphs 1 through 60 as though fully set forth herein.

62.    Samsung ECL reproduced CCP Software, namely, the JScribe Core software, in the process of creating the Firmware. Although the parties' agreements contemplated distribution of the Firmware (and with it, the CCP software) only embedded within a printer or other device, Samsung ECL bundled the Firmware for independent distribution on portable media, such as CDs or external hard drives, as well as by email distribution in code files. This bundling involved reproduction of CCP's JScribe Core software.

21414822\V-1

63.     Once bundled and uploaded to such portable media or prepared for email distribution, Samsung ECL distributed that Firmware (including the JScribe Core software) to customers in the United States, through its US affiliate Samsung America in New Jersey.

64.     Samsung ECL and Samsung America distributed some Firmware to customers who had already purchased a device containing an earlier version of the JScribe Core software. This Complaint will refer to this delivery as a "field upgrade."

65.     Samsung ECL and Samsung America also distributed the Firmware to customers who had already purchased a device that did not contain any version of the JScribe Core software. This Complaint will refer to this delivery as a "field installation."

66.     With each "field installation" and "field upgrade," Samsung ECL and Samsung America provided the customer with detailed instructions showing the customer how to install the Firmware onto an existing Samsung-brand device. These instructions effectively allow a customer to obtain the JScribe functionality without purchasing a JScribe-embedded device. Upon knowledge and belief, Samsung America and Samsung ECL have performed field installations and field upgrades for customers.

67.     In addition to directly distributing the Firmware to customers, Samsung ECL and Samsung America made the Firmware (including the JScribe Core software) available on the Download Center Website and the Samsung Printer Website, along with detailed instructions showing a customer (or other web user) how to install the Firmware onto a Samsung-brand printer to achieve the functionality of a Samsung-brand printer with JScribe Core embedded.

68.     CCP never consented to or authorized the reproduction and distribution of its software products as "field installations" and "field upgrades."

69.     CCP has suffered damages as a result of this infringing conduct.

70.    CCP has suffered irreparable harm because of Samsung ECL's and Samsung America's infringement of its copyright in the JScribe Core software, and will continue to suffer irreparable harm in the future unless Samsung ECL and Samsung America are enjoined from infringing CCP's copyright in the JScribe Core software.

WHEREFORE, CCP requests the following relief against Samsung ECL and Samsung America:

a)    an award of compensatory damages and disgorgement of any profits of the Defendants attributable to the infringement, along with prejudgment interests and costs;

b)    a permanent injunction prohibiting Defendants Samsung ECL and Samsung America and their officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and all those controlled by or acting in concert with or in privity with any of them, from infringing CCP's copyrights in the JScribe Core software, specifically, by prohibiting these Defendants from reproducing and distributing the JScribe Core software via the "field installations" and "field upgrades" as described herein, and by otherwise reproducing, distributing, displaying or preparing derivatives of the CCP Software;

c)    a Court order requiring said Defendants to impound any infringing articles in their possession, custody, or control; and

d)    such other relief as this Court deems just and proper.

## COUNT V - COPYRIGHT INFRINGEMENT: DEFENDANT IBM

71.    CCP incorporates the allegations of paragraphs 1 through 70 above as though fully set forth herein.

72.    CCP has registered a claim to copyright in the JISS OpenPower software with the United States Copyright Office.  The Copyright Office has assigned registration number TXu-1-610-847 to the JISS OpenPower claim to copyright.

73.    As noted above, CCP terminated the IBM Germany Agreement on May 25, 2009. Nevertheless, prior to May 25, 2009, and at least as early as December, 2006, the license to the JISS OpenPower software in the IBM Germany Agreement had expired by its own terms.

74.    Upon information and belief, IBM has reproduced the JISS OpenPower in the process of selling servers and other devices, after December of 2006, and in any event after May 25, 2009. This reproduction of JISS OpenPower constitutes infringement of CCP's copyrights in the JISS OpenPower software.

75.    Since December 2006, IBM has continued to market and, upon information and belief, sell products incorporating the JISS OpenPower software. For example, price lists and descriptions of products incorporating JISS OpenPower are available (at least as of August 7, 2009) on IBM's website.  See Exhibit C.

76.    Upon information and belief, IBM has publicly distributed the JISS OpenPower software in the United States, after December 2006.  This public distribution of JISS OpenPower constitutes infringement of CCP's copyrights in the JISS OpenPower software.

77.    CCP has suffered damages as a result of this infringing conduct.

21414822\V-1

78.    CCP has suffered irreparable harm by IBM's infringement of CCP's copyrights in the JISS OpenPower software, and will continue to suffer irreparable harm in the future unless IBM is enjoined from infringing CCP's copyrights in that work.

WHEREFORE, CCP requests the following relief against IBM:

a)    an award of compensatory damages and disgorgement of any profits of IBM attributable to the infringement, along with prejudgment interests and costs;

b)    permanent injunctive relief prohibiting IBM and its officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and all those controlled by or acting in concert with or in privity with any of them, from infringing CCP's copyrights in the JISS OpenPower software, specifically, by prohibiting IBM from reproducing and distributing the JISS OpenPower software in devices, and by otherwise reproducing, distributing, displaying or preparing derivatives of the JISS OpenPower software;

c)    a Court order requiring IBM to impound any infringing articles in its possession, custody, or control; and

d)    such other relief as this Court deems just and proper.

## COUNT VI - PATENT INFRINGEMENT (U.S. PATENT NO. 6,684,789) AGAINST SAMSUNG AMERICA, SAMSUNG ECL, AND SAMSUNG NETWORKS

79.    CCP incorporates the allegations of paragraphs 1 through 78 above as though fully set forth herein.

- 18 -

80.     On February 3, 2004, the United States Patent and Trademark Office (USPTO) duly and legally issued U.S. Patent No. 6,684,789 ("the '789 Patent") entitled "Method and System for the Transformation of Digital Print Data Streams and Corresponding Printer and Printer Server," was duly and legally issued to CCP, as assignee of inventor Thomas Krautter (a CCP employee). A copy of the '789 Patent is attached hereto as Exhibit B.

81.     Samsung ECL, Samsung America, and Samsung Networks have been and are infringing, inducing infringement and/or contributing to infringement of the '789 Patent in this District, and throughout the United States, by making, selling, offering for sale, and/or importing infringing devices, software and other technology covered by one or more claims of the '789 Patent, including at least Samsung ECL's printer devices incorporating the JScribe Core technology.

82.     As a direct and proximate result of the Defendants' infringement of the '789 Patent, CCP has suffered and continues to sustain monetary damages.

83.     CCP has been and continues to be irreparably harmed by the Defendants' infringement of the '789 Patent. On information and belief, the Defendants will continue to infringe unless such infringement is enjoined by this Court.


    WHEREFORE, CCP requests the following relief against the Defendants:

a)  an award of compensatory damages and disgorgement of any profits of the Defendants attributable to the infringement, along with prejudgment interests and costs;

b)  a permanent injunction prohibiting Defendants and their officers, agents, divisions, affiliates, subsidiaries, employees, and representatives, and all those controlled by or acting in concert with or in privity with any of them, from infringing, inducing the

- 19 -

infringement and/or contributing to the infringement of the '789 Patent pursuant to 35 U.S.C. §283; and

c)   such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff CCP demands a jury trial on all issues.

Dated: August 25, 2009

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By:   ___s/ Marc S. Friedman_____
        Marc S. Friedman
        101 JFK Parkway
        Short Hills, NJ 07078

        and

        1221 Avenue of the Americas
        New York, NY 10020

        212.768.6700
        Fax: 212.768.6800
        mfriedman@sonnenschein.com
        bdelfin@sonnenchein.com
        rstroder@sonnenschein.com

        *Attorneys for Plaintiff CCP Systems AG*

Of Counsel:
Benito Delfin, Jr.
Rebecca Stroder

21414822\V-1

## VERIFICATION OF CHRISTOPH PICHT UNDER 28 U.S.C. § 1746

I have read the foregoing Complaint. I have personal knowledge of the truth of the allegations contained therein, except for those allegations made upon information and belief.. For those allegations made upon information and belief, I believe them to be true.

I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed the 25th day of August, 2009

_____
Christoph Picht

# EXHIBIT A



**FixYa** Technical Support, Instructions, & Repair Service

Home | My Expertise | Sign In

**Find a Solution**                    [ Search ]

All Products > Samsung > SCX-6345N Printer > Troubleshooting



## I need to know where obtain the firmware to

mazalazar on Jun 24, 2009

I need to know where obtain the firmware to SCX-6345 with Jscribe 4.o included

Comments:

Jun 25, 2009 - Komguy

thank

**LPR/LPD Printing Solution**                    Sponsored Links
UniPrint enables LPR/LPD systems to Windows printing. Fast & flexible.
www.UniPrint.net

**Laser Printer**
Solutions for Your Small Business Business Begins Here.
www.business.com

**Encad Driver Downloads**
Free Encad Driver Downloads. Update Your Encad Drivers Now.
DriverDownloadFiles.com/Encad

I Can Solve This!      I have a similar problem      Post a new problem

---

**Best Solution**
posted on Jun 24, 2009

 **komguy**
Rank: Guru
Rating: 89%, 358 votes

If you can't get this firmware at Samsung.com, let me know, I can get it from the service site and e-mail it to you.

Was this helpful?   Yes   No   1 person thought this was helpful

**Solution #2**
posted on Jul 21, 2009

 **msalvadorcan**
Rank: Apprentice
Rating: 0%, 0 votes

If you do not have the corresponding NIC-Firmware it will not work. Thats the problem i have currently.

Was this helpful?   Yes   No

**Need Parts & Services?**
- Chat Live with a Top Printer Expert
- Find the Top Printer Repairers in your area

## Solve this problem

Do you have a solution to this problem?

Share your knowledge with the FixYa Community today!

Post Solution

**Related Problems**

gyrene9940 just asked: Trying to print from desk to. wants to scan. - Solve this!      Can you Solve these Problems?

---

### Ask our Experts

Describe your Samsung SCX-6345N Printer Problem

☐ Get Immediate Assistance!      Ask

### Chat with a Pro

Printers Tech
Chat Live Now!

Ads by Google
**Print IPDS to any Printer**
Use any of your Windows printers For real AFP/IPDS host printing
www.intermate.com

**Printer Graphics**
Search Thousands of Catalogs for Printer Graphics
www.globalspec.com

**Wann haben Sie sterben?**
10 wichtigen Thema. Machen Sie eine Tötung und nicht wissen! 2,99e/5t
www.Todes-Test.com

### More Common Problems

For Samsung SCX-6345N Printer:
Samsung SCX-6345N Printer

Related Products & Issues:
6345   jsc   JScribe   sansung scx 6345
firmware

### Top Printer Experts

adirondacktr
Rank: Guru
Rating: 86.0%, 155 votes
Solutions: 431
Member Since: July 2009

Experience: hands on experience,training, mechanically gifted,and favorite reading material is how to fix things

Ask Me

Find more Printer Experts

### Solve Your Problem Now!

Chat Live with an Expert

Chat Now





**printer program**
Gday, I have installed printer drivers for a Canon Pixma ip4200 with no problems. On...
*Printers*
**1 Solution**

**LEXMARK X1240 All In One**
Will not use color cartridge and pisplay statis shows the cartridge is full...
*Printers*
**1 Solution**

**Unable to print or copy Brother MFC-440CN**
I am unable print, copy from this unit. The message is Unable to print 8F. There is...
*Printers*
**1 Solution**

**I have the pixma ip5300 printer and I need...**
I love this printer. It has six ink cartridges. After many printings on printable...
*Printers*
**1 Solution**

Can you Help with these Printer problems?

**need to have printer down loaded to...**
I need to have a printer driver down load for Lexmark printer model # 4126-003. I have windows XP... (More)
*Printers*
Solve

**error 0xc18a0301 ink system failure**
error 0xc18a0301 ink system failure
*Printers*
Solve

**Changed both color and b/w...**
Changed both color and b/w cartridge. Now anything printed off internet prints in pink color only... (More)
*Printers*
Solve

**I have a dell 948 printer that will...**
I have a dell 948 printer that will not scan. When I hit "scan to computer" it says "downloading... (More)
*Printers*
Solve

**NIC-Firmware for SCX 6345**
Hello, I would need the corresponding NIC-Firmware for JScribe enabled SCX 6345N. Could someone help... (More)
*Samsung SCX-6345N...*
Solve

Sponsored Links

Ads by Google

**Netviewer Online**
Softwarelösungen zur Zusammenarbeit via Internet. Jetzt gratis testen!
www.netviewer.de

**HP Printer Drivers**
Free Download: Official HP Drivers. Latest HP Printer Driver Updates!
HP-Printer.OfficialDrivers.net

**PLOTTER ENCAD**
Finden Sie Plotter Encad Vergleichen Sie unsere Angebote!
www.Excite.de/Plotter+Encad

**Photo Printer kaufen**

gyrene9940 just asked: Trying to print from desk to. wants to scan. - Solve this!

Can you Solve these Problems?

Wir haben 2.900+ Drucker. Photo Printer im Angebot!
www.NexTag.de/Drucker

Used XXL Digital Printers
We connect sellers and buyers Wherever they are
www.superwidesolutions.de

## Didn't find what you were looking for?

Describe your problem:

Post Problem

☐ Get Immediate Assistance!

| | | |
|---|---|---|
| Solutions to Most Common SCX-6345N Printer Problems | Browse Experts | About FixYa | Blog |
| See other Samsung Printers | Find Products | News | Advertisers |
| See other Samsung Products | Find Cars | Contact | Partners |
| See other Printers | Find Manuals | Terms | Careers |
| All Brands | Repair Service Directory | Privacy Policy | FAQ |
| | Ratings & Recommendations | | |
| | Tags | | |

Find a Solution                    [                    ]    Search

FixYa does not evaluate or guarantee the accuracy of any information provided through its proposed solutions, posts, or Expert Assistance Sessions. By entering this site you declare you read and agreed to its Terms. You may NOT copy or distribute the content that appears on this site without written permission from FixYa Ltd.

© 2005-2009, FixYa, Ltd. or its affiliates

gyrene9940 just asked: Trying to print from desk to. wants to scan. - Solve this!        Can you Solve these Problems?

# EXHIBIT B



US006684789B2

(12) **United States Patent**
Krautter

(10) Patent No.: **US 6,684,789 B2**
(45) Date of Patent: **Feb. 3, 2004**

(54) **METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER**

(75) Inventor: **Thomas Erfinders Krautter**, Stuttgart (DE)

(73) Assignee: **CCP Systems AG**, Stuttgart (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/275,784**

(22) PCT Filed: **May 11, 2001**

(86) PCT No.: **PCT/DE01/01796**

§ 371 (c)(1),
(2), (4) Date: **Nov. 7, 2002**

(87) PCT Pub. No.: **WO01/88840**

PCT Pub. Date: **Nov. 22, 2001**

(65) **Prior Publication Data**

US 2003/0140809 A1 Jul. 31, 2003

(30) **Foreign Application Priority Data**

May 17, 2000    (DE) ......................................... 100 24 177
Jan. 26, 2001    (DE) ......................................... 101 03 733

(51) Int. Cl.⁷ ......................................... B41F 1/54
(52) U.S. Cl. ......................... 101/484; 101/486; 400/61; 400/62
(58) Field of Search ................................. 101/484, 485, 101/486; 400/61, 62, 63, 76; 358/1.1, 1.9, 1.15, 1.16, 1.17, 1.18

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,216,754 A | | 6/1993 | Sathi et al. |
| 5,566,278 A | * | 10/1996 | Patel et al. .................. 358/1.15 |
| 6,006,013 A | | 12/1999 | Rumph et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 109 615 B1 | 6/1994 |
| EP | 0 964 339 A2 | 12/1999 |
| EP | 1 061 456 A2 | 12/2000 |
| GB | 2 357 348 A | 6/2001 |
| WO | WO-00/17748 | 3/2000 |
| WO | WO-00/55720 | 9/2000 |

* cited by examiner

*Primary Examiner*—Andrew H. Hirshfeld
*Assistant Examiner*—Minh Chau
(74) *Attorney, Agent, or Firm*—Squire, Sanders & Dempsey L.L.P.

(57) **ABSTRACT**

A method for the transformation of digital print data streams, in which an input print data stream (2) is read in, this is analyzed by means of a parser (4) for graphically representable objects (5, 5a) and is split up into these graphically representable objects (5, 5a), and the graphically representable objects (5, 5a) are stored in a memory (6) in an object-oriented format, and the graphically representable objects (5, 5a) stored in the memory (6) in an object-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and the objects thus transformed are combined into an output print data stream (10) and are output, graphically representable objects (5, 5a) being stored in the memory (6) in an object-oriented format, to which at least one stored script (5a) is assigned, which is executed in the cases defined in the script (5a).

**53 Claims, 1 Drawing Sheet**



**U.S. Patent**            Feb. 3, 2004         US 6,684,789 B2

# FIG. 1



US 6,684,789 B2

1

## METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER

The present invention relates to a method and system for the transformation of digital print data streams and corresponding printer and printer server.

Virtually all the output devices which are common nowadays use "page description languages", also called PDL, to produce printed documents. Here, an application program controls a driver for the output device (for example a printer driver). This driver converts information about the graphic objects to be output—for example text or image information—into the respective PDL suitable for the output used, so that the latter can hereby be controlled directly.

More recent output devices, such as laser printers or digital color printers for example, also offer the possibility of buffering the data streams coming in to control them and, for example, using them as an original form for further incoming print data. This makes it possible to dispense with forms needed for the respective printing, such as letter paper, invoice forms or the like for example, in the individual case. Instead, the application software respectively used merely calls up the form stored once in the printer and combines it with the current print data. In this way, the accumulation of data, for example in networks, can be reduced considerably. However, the result is also organizational advantages: since the forms used no longer have to be kept in reserve by each individual user on his computer, in this way standardized use forms can be achieved, which firstly helps to ensure the often desired standard appearance of a company or an institution and secondly also makes it easier to use current form versions.

However, these aforementioned advantages are normally not used, since the printers used in a company or an institution—with regard to their control—are often not uniform and therefore the use of the functions described above is too complicated, since the appropriate forms either have to be available for each printer model used, which would be very labor-intensive, or only specific printers can be used for specific applications, which is very inflexible.

One possibility of solving this problem is to circumvent the abovedescribed inhomogeneity of the output devices used by employing methods for the conversion of various data stream formats for controlling output devices, which makes it possible for all the computers which produce print data streams to be output to use a standard format for this purpose, by each printer being assigned an interface—be it a dedicated device, be it merely in the form of a software filter—which makes use of such a method and, on the side of the input data stream, uses the format to be used uniformly and, on the side of the output data stream, uses the specific format of the printer to be controlled.

Such a solution is described, for example, by EP 0 109 615 B1, which refers to a method for the conversion of text which is represented in the form of digital data. However, the method taught by this document has considerable disadvantages with regard to the possibilities of current systems from information technology: for example, the method is only suitable only for those input print data streams which, in their syntax, follow a format description language whose syntax may be described with the aid of "regular expressions". This is because the method taught in EP 0 109 615 B1 makes use of a status machine, implemented by means of "key status variables", for the recognition and conversion of input control objects recognized in the input print data

2

stream into output control objects. These output control objects are in this case produced directly from the input control objects—specifically in accordance with a fixed assignment—as a function of the respective state representing the key status variables. Such a procedure corresponds to the functioning of the theoretical model of the Moore or Mealy machines, which operate quite efficiently but permit only, the recognition of regular expressions. For these circumstances surrounding information technology at the priority date of EP 0 109 615, such a simple possible transformation may have been sufficient, since—as can already be gathered from claim 1 there—only text had to be converted, apart from format information.

For the current circumstances of PDLs or else other input formats to be recognized where possible, such as HTML or XML, this no longer applies in any way, however. In the meantime, these have been built up in such a complex way with regard to their possibilities that a status machine is no longer in any way adequate for their recognition and conversion.

However, the target format, into which the print data stream is to be transformed, nowadays places high requirements on a transformation: although in principle there would be the possibility here likewise of using the smallest common multiple of the functions of current printing format and in this way of reducing the effort on transformation, this convenience in the design of the transformation process would be brought at great expense in the operation of the method, since in this way the accumulation of data in networks would be increased again, since powerful printer control possibilities which as a rule become more and more specific with regard to the printer type used as the complexity increases, would necessarily have to be dispensed with. Such an increased accumulation of data would, however, again stand in the way of the objective of reducing the data traffic in the network by using PDLs. Thus, at the same time, there is a requirement on the transformation process that the latter produces the preconditions that the target formats can be produced in the most flexible manner possible with all their available printing functions, in order that the traffic on the data transmission lines can thus be minimized.

Furthermore, it is necessary to state that printing systems, even today, still only fulfill a single purpose: namely printing. All the manufacturers of laser printers and digital copying systems have made great efforts in recent years to match the processor powers, storage capacities and additional options (such as memory cards, hard drives, network cards) of these systems to the increasing requirements. However, the manner in which printers and copiers are controlled and programmed has not changed significantly in the last ten years.

Printing systems are still controlled by a page description language (PDL) such as PCL, Postscript or Prescribe. It permits a document and its components to be described adequately. However, the many additional options of modern printing and copying systems available in the meantime cannot be used. The consequence of this is that, even today, the entire printing process is controlled and monitored by a host computer. Its task substantially comprises converting the respective information exactly into the page description language "understood" by the printing system.

It is therefore an object of the present invention to specify a method for the transformation of digital print data streams which is both capable of recognizing more complex page description languages, whose syntax may no longer be described with the aid of simple regular expressions, and also provides the preconditions that the recognized graphic

US 6,684,789 B2

3

objects can be transformed into a target format, but also processed further, as flexibly and effectively as possible, that is to say with regard to their description at the highest possible level of abstraction.

According to the invention, this object is achieved by a method for the transformation of digital print data streams, in which an input print data stream is read in, this is analyzed by means of a parser for graphically representable objects and is split up into these graphically representable objects, and the graphically representable objects are stored in a memory in an object-oriented format, and the graphically representable objects stored in the memory in an object-oriented format are transformed into a format for the control of an output device, preferably a printer, and the objects thus transformed are combined into an output print data stream and are output and, which, according to the invention, is characterized in that graphically representable objects are stored in the memory in an object-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

In this case, as opposed to the use of a status machine, the analysis and splitting of the input print data stream by a parser (syntax analyzer) ensures that the syntax of the page description language is no longer restricted to the use of regular expressions, but that powerful page description languages can also be used. Instead, such a parser, in terms of its theoretical performance, corresponds to a Turing machine and therefore ensures the theoretically maximum achievable performance for the analysis and splitting up of formal languages.

Furthermore, storing the graphically representable objects—and therefore of course also the scripts, which themselves are certainly also graphically representable objects—in a memory in an object-oriented format achieves the situation where the objects recognized by the parser are then available in this intermediate format which is extremely beneficial for further processing.

The objects are preferably managed here by means of a "display list management", which supports one-page and multi-page documents at as many levels as desired and which can be expanded dynamically by new objects. The individual graphic objects are stored by using their membership of specific—expediently suitably hierarchically organized—classes such as relating to the class of points, ellipses, circles, lines, polygons, rectangles, squares or else to the more complex object types, such as bar codes, more complex texts or freely definable elements such as color profiles or fonts, which permits their effective conversion into an output print data stream, since, through the class of the respective object, there is already implicit information available about its possible transformation into the format of the output print data stream. For example, via an object of the type square, it is already known from the object class hierarchy that this is a subclass of the rectangle. If, then, the target format for which an output print data stream is to be produced provides speech constructs relating to the description of rectangles in the page description language, then it is clear, merely on the basis of the position of the square in the object class hierarchy, that this is also a rectangle—albeit with special characteristics—and to this extent the possibilities of the target format with regard to rectangles can also be used for an object in the square class.

In addition to such implicit information—which can be derived from the object class hierarchy—about the individual objects, however, it is also possible to add to the objects explicit information about their possible conversions into specific target formats, it being advantageously possible

4

for this also to be combined with the abovedescribed implicitly provided information, for example by a conversion method into a specific target format being added to a class which is arranged higher in the object class hierarchy, and then automatically also being available to the objects of subordinate, lower-ranking classes by way of inheritance, if a better specified method is not already assigned to said subordinate classes.

In one embodiment of the method according to the invention, the graphically representable objects are combined into super-objects of higher complexity before being stored in the memory.

The super-objects obtained in this way are then stored in the memory in the object-oriented format. In this way, less complex graphic objects can be combined to form more complex graphic super-objects. For example, sequences of lines which in each case join one another at the ends and have been recognized as graphic objects in the input print data stream can be combined to form a graphic polygon super-object. Such a combination offers various advantages, such as easier handling of the super-object stored as a whole as compared with the individual objects, since said super-object can then be treated uniformly by the methods for the super-object class with effect for all the part objects combined in it. It also helps, in certain circumstances, to further minimize the data traffic on the transmission lines used, since an object once combined is subsequently also forwarded in combined form in the output print data stream—if technically supported there—which generally requires a lower data volume to be transmitted than the transmission of the individual objects.

A preferred embodiment of the method according to the present invention is characterized in that a parser is used for the analysis and splitting up into the graphically representable objects, which, in the theoretical model, corresponds to an automatic push-down facility and which is therefore capable of analyzing and splitting up languages with "context-free grammars" particularly effectively.

A further embodiment of the method according to the present invention is characterized in that feedback messages referring to the output print data stream output are read in and are analyzed for error messages which indicate that the output device, preferably the printer, has recognized a transformed graphic object in the output print data stream which cannot be output by said printer, this graphic object is then split up into part objects of lower complexity, and the part objects thus obtained, in the format for the control of the output device, are slipped into the output print data stream which is output to the output device.

In this way, it is likewise possible to test whether the driven output device is, for example, capable of recognizing and outputting a bar-code object directly or not. If it is not capable of this and reports this back, then the bar code is simply split up into objects of the next lower hierarchy, for example filled rectangles, and a further try is made with these objects. This is continued until—if necessary until the graphic objects are split up into individual points—the output attempt is successful. The object-oriented data structure with its object hierarchy, chosen for the intermediate format, also proves to be particularly suitable for this procedure. For the further performance of the method, it is preferably noted at which level of the object classes in each case the splitting process was successful for a specific output device, in order then, in the next attempt, already to begin the output process at this level, in order also thus to avoid unnecessary data transfers, but likewise to utilize the maximum level of abstraction of the output device. In this way,

US 6,684,789 B2

5

the data volume to be transmitted is reduced to the necessary extent, even with high flexibility.

In an embodiment of the method according to the present invention, at least one graphically representable object stored in the memory in the object-oriented format is assigned at least one script which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment, which permits the incorporation of all the devices needed in the widest sense for document processing.

A further preferred embodiment of the method according to the invention is characterized in that at least one graphically representable object stored in the memory in the object-oriented format is assigned at least one script which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

The script automatically receiving data can preferably also request this data automatically.

It is likewise possible that a script also sends data automatically, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails, it being able in particular also to send the graphic object associated with itself to a receiver.

It can also in turn reassign the data received by it to the graphic object associated with it, and forwards the graphic object associated with itself to a receiver together with the data requested, received and reassigned by itself, or else print out said data.

In relation to the above explanations, it should be noted that the embodiments of the method according to the invention which themselves provide other objects with objects, for example by forwarding them or keeping them ready to receive or for interrogation by a script, for example, are also covered by the term "dynamic object linking" (DOL).

Systems that operate on the method according to the invention, such as printing systems, are capable of sending and receiving e-mails and of printing original print and image data without a printer driver. They are able to store any desired information on hard disks or memory cards and make said data available to all the devices connected in the network and Internet. In other words, they independently undertake demanding tasks in information processing and provision, in order to relieve host computers and personal computers of quite a lot of administrative tasks. In a heterogeneous network and printing environment with laser printing and copying systems from different manufacturers in combination with impact printers and special printing systems, they also make it possible to administer all the connected printing systems with the aid of a single standardized programming language, namely the script language, and therefore reduce the effort on administration to a minimum. At this point, it should be mentioned that these systems operating by the method according to the invention are also designated JScribe (registered trademark) systems and, accordingly, the method according to the invention is also designated JScribe (registered trademark).

When JScribe (registered trademark) is used, developers and system houses will therefore be in a position to provide objects and functions which are stored in resident form in the printing system and permit and control desired individual operating sequences. These objects and functions can use any functionality provided by the JScribe (registered trademark) basic technology, including extremely demanding commands for the job or page processing and for the

6

complete control of the print data and emulations. The method according to the invention preferably also enables access to internal printer functions and status information (page counter, network components, file system and so on), for example via a script.

The method according to the invention is preferably characterized in that graphically representable objects are stored in the memory in an object-oriented format, to which at least one stored script is assigned, which is executed in the case of the output of the object defined in the script. In this way, for example, it is possible to execute such scripts, for example Visual Basic Scripts, Java Scripts or else "stream code" in an event-oriented manner, for example in the case where a form object is printed out, likewise "ON-PRINT" by which means, for example, to execute such functions as the printing of copies of the same form with the same net data but on different paper from different trays. In particular in interaction with those embodiments of the method according to the invention which control external devices, such as folding or enveloping machines or else stapling machines, this is particularly advantageous.

However, it may also be the case that at least one case relating to the execution of the script is defined in the respective script and occurs automatically, preferably without further influence from outside.

For example, the automatically occurring case, defined at least in the respective script, relating to the execution of the script can be configured as a timer, that is to say as a case which occurs automatically as a result of the expiry of a time, this timer preferably operating cyclically, that is to say starting itself again upon expiry.

Automatic scripts can therefore intrinsically become active and, for example, load the daily newspaper, where possible itself assembled from different sources, from the Internet, assign the found, loaded and analyzed information to a stored object and then print this object, completely without the participation of a PC or other host computer to which the printer would be connected.

For example, the simple download of JScribe (registered trademark) sequences (scripts with appropriately assigned objects) can, for example, arrange for the printer automatically to fetch information about current share prices, to format it and to print it out. Image information, text documents, web pages, XML documents and any other desired print data can be analyzed while dispensing with any preparation by the PC (for example by a printer driver), modified if necessary and printed out in optimum quality. Since JScribe (registered trademark) can also be employed simultaneously as a server version for computer systems, printing systems are for the first time made capable of accessing stocks of data on host systems (for example SQL databases) interactively during the printing operation.

The language used for the scripts according to the present invention is preferably Java Script. Java Script, as a world-established standard for the script-controlled, intelligent programming of web pages, has triggered in the Internet an avalanche of innovative and functional solutions which have contributed decisively to ringing in the age of eBusiness and eCommerce. This intelligent technology, which has so decisively marked the worldwide, rapid development of the Internet, is therefore now also available for printing systems for the first time and here preferably forms the basic technology for script applications in the area of the present invention, and consequently print and document management, which is certainly uniquely and, as compared with established solutions, considerably more cost-effective.

With JScribe in conjunction with Java Script, an innovative technology is therefore provided which allows any

US 6,684,789 B2

7

corresponding print system operated in accordance with the method according to the invention to be programmed just as simply as an Internet homepage. The communications possibilities already described, together with the logically modular object-oriented construction of JScribe and the Java-Script-typical expansion possibilities ideally supporting JScribe permit within the shortest possible time the construction of complex output management systems for an extremely wide range of applications.

A further preferred embodiment of the method according to the present invention is characterized in that the graphically representable objects stored in the memory in an object-oriented format, preferably also script objects (for example Java Script objects), preferably before they are output in the output print data stream, are kept ready by an application interface to be read out, to be changed, to be deleted or to have new objects appended.

According to the prior art, hitherto the page descriptions necessary for the storage of forms in the output devices had to be created laboriously by hand, that is to say programmed in the respective page description language—time-consuming and expensive work which can be carried out only by a few programmers qualified to do this. The same also applies to changes in the stored data.

The object-oriented intermediate format now makes it possible for the stored graphically representable objects to be kept ready to be read out, to be changed, to be deleted or for new objects to be appended, in a technically elegant manner via an application interface, by assigning the methods required for this to the respective objects in accordance with their class hierarchy. This means that the objects stored in the memory can, for example, be displayed on a screen and modified as desired. Here, too, deleting existing objects and appending new objects are also possible.

By means of binding suitable application software—also called FormMaker—it is therefore made possible in particular for each EDP user to modify existing forms and to create new forms entirely without any programming knowledge, which likewise applies to scripts.

Given suitable selection of the application interface and processing methods correspondingly available to a sufficient extent for the object classes used, a graphic core system with a functional interface is thus made available, which can be used by applications for graphic user interfaces, such as those based on the Windows operating system, to display the object data as a standard document on the screen and to modify it with different processing tools.

The application interface also preferably permits script objects, preferably Java Script objects themselves, to be read out graphically, to be changed, to be deleted or to be appended, these graphically performed manipulations being automatically transformed, if required, into script objects, preferably Java Script objects. It thus provides a complete graphic development environment for computers, preferably computers operating under the Windows operating system, which permits the printing and copying systems to be programmed without Java Script knowledge.

In addition, already existing development tools which are based on Java can likewise be used for the development of individual JScribe (registered trademark) applications.

The use of "FormMaker" application software permits the design of "intelligent" electronic forms, which are transformed into logical documents with the aid of JScribe (registered trademark). These in turn can be made available in systems connected to the network and output at any desired location by any desired printing systems, preferably laser printing systems and digital copying systems, sent as e-mail or else transferred to archiving systems.

8

The present method according to the invention can also be present implemented on a system for the transformation of digital print data streams comprising at least one data processing unit having at least one memory and at least one communications interface, the data processing unit being programmed in such a way that it operates in accordance with an embodiment of the method according to the invention.

In this case, the system preferably also has an operating station with display means and input means, which makes it possible for the graphically representable objects stored in the memory of the data processing unit in an object-oriented format, preferably also script objects, to be read out via the application interface, to be changed, to be deleted or to be appended, preferably before they are output in the output print data stream.

In addition, the system according to the invention can moreover permit respectively stored objects, preferably even script objects themselves, such as Java Script objects, to be read out graphically, to be changed, to be deleted or to be appended, these graphically performed manipulations being transformed automatically, if required, into Java Script objects.

The system according to the invention can also be integrated into a printer or a printer server.

JScribe (registered trademark) can therefore not only be employed directly on printers and digital copying system but can also be implemented on PC server platforms.

For installation purposes on printing systems, the JScribe script sequences can, for example, be incorporated into a Prescribe (registered trademark) data stream. The printing system receiving this data, for example the appropriate laser printer or digital copier, will read in and compile the program code.

This permits the configuration of networks with hardware units which are small but equipped with high functionality, which have a common interface and permit access relating to archiving documents, to distributed printing (cluster printing) and security printing and much more.

The abovedescribed embodiments of the method according to the present invention can of course in each case also be implemented as a computer program product which has a computer-readable medium with computer program code means or as a computer program on an electronic carrier signal and in which, in each case after the computer program has been loaded, the computer is caused by the program to carry out the method according to the invention described here.

In the following text, an exemplary embodiment, not to be understood as restrictive, will be discussed by using the drawing, in which:

FIG. 1 shows the sequence of an embodiment of the method according to the invention using a schematic representation.

FIG. 1 shows the sequence of an embodiment of the method according to the invention using a schematic representation. From a computer 1, an input print data stream 2 is sent to a device 3—for example a computer such as a PC or else an intelligent output device such as an intelligent printer—which operates in accordance with the method according to the present invention. There, the input print data stream 2 is analyzed and split up by a parser 4. The graphic objects 5, 5a recognized as the product of this splitting are stored in a memory 6 in an object-oriented format; this is after they have possibly been combined to form super-objects. The objects 5 stored in the memory 6, preferably script objects 5a, are kept ready to be read out via

US 6,684,789 B2

9

an application interface 7, to be changed, to be deleted or for new objects to be appended. In this way, the objects 5, 5a stored in the memory 6 can, for example, be displayed on a screen 9 and modified as desired. Deleting existing objects and appending new objects is also possible here. If suitable application software is used, it is thus possible for any user to modify existing forms easily and without programming knowledge or to create new forms easily and without programming knowledge or to create new forms. The graphically representable objects 5, 5a stored in the memory 6 in an object-oriented format are transformed into a format for the control of an output device, preferably a printer 9, in order to be output, and the objects 5, 5a thus transformed are combined into an output print data stream 10 and output. Feedback messages 11 concerning the output print data stream 10 output are read in and analyzed for error messages which indicate that the printer 10 has detected a graphic object 5, 5a in the output print data stream 10 which cannot be output or processed by said printer. This graphic object 5, 5a is then split up into part objects of lower complexity, and the part objects obtained in this way, in the format for the control of the printer 9, are slipped into the output print data stream 10 which is output to the printer 9.

What is claimed is:

1. A method for the transformation of digital print data streams, in which

   (i) an input print data stream (2) is read in,

   (ii) this is analyzed by means of a parser (4) for graphically representable objects (5) and is split up into these graphically representable objects (5), and

   (iii) the graphically representable objects (5) are stored in a memory (6) in an object-oriented format, and

   (iv) the graphically representable objects (5) stored in the memory (6) in an object-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and

   (v) the objects thus transformed are combined into an output print data stream (10) and are output,

characterized in that graphically representable objects (5, 5a) are stored in the memory (6) in an object-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

2. The method as claimed in claim 1, characterized in that the graphically representable objects (5, 5a) are combined into super-objects of higher complexity before being stored in the memory (6).

3. The method as claimed in claim 1, characterized in that feedback messages (11) referring to the output print data stream (10) output are read in and are analyzed for error messages which indicate that the output device (9), preferably the printer, has recognized a transformed graphic object in the output print data stream (10) which cannot be output by said printer, this graphic object is then split up into part objects of lower complexity, and the part objects thus obtained, in the format for the control of the output device (9), are slipped into the output print data stream (10) which is output to the output device (9).

4. The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment.

5. The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least

10

one script (5a) which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

6. The method as claimed in claim 5, characterized in that the script (5a) automatically receiving data also requests this data automatically.

7. The method as claimed in claim 5, characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with itself, and prints out the graphic object (5) assigned to itself together with the data requested, received and reassigned by itself.

8. The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically sends data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

9. The method as claimed in claim 8, characterized in that the script (5a) sends the graphic object (5) associated with itself to receiver.

10. The method as claimed in claim 9, characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with itself, and prints out the graphic object (5) assigned to itself together with the data requested, received and reassigned by itself.

11. The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which is executed in the case of the output of the object (5) defined in the script (5a).

12. The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a), at least one case relating to the execution of the script (5a) being defined in the respective script (5a), and occurring automatically, preferably without further influence from outside.

13. The method as claimed in claim 12, characterized in that the automatically occurring case, defined at least in the respective script (5a), relating to the execution of the script (5a) is configured as a timer, that is to say as a case which occurs automatically as a result of expiry of time.

14. The method as claimed in claim 13, characterized in that the timer operates cyclically, that is to say it starts itself again upon expiry.

15. The method as claimed in claim 1, characterized in that Java Script is used as a formal language for the scripts.

16. The method as claimed in claim 1, characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.

17. A system for the transformation of digital print data streams comprising at least one data processing unit having at least one memory and at least one communications interface, characterized in that the data processing unit is programmed in such a way that it operates in accordance with the method as claimed claim 1.

18. The system for the transformation of digital print data streams as claimed in claim 17, the system also has an operating station with display means (8) and input means, which makes it possible for the graphically representable objects (5) stored in the memory (6) of the data processing

11

unit in an object-oriented format, preferably also script objects (5a), to be read out via the application interface (7), to be changed, to be deleted or to be appended, preferably before they are output in the output print data stream (10).

19. The system for the transformation of digital print data streams as claimed in claim 17, wherein the data processing unit, permits respectively stored objects, preferably also Java Script objects (5a) themselves, to be read out graphically, to be changed, to be deleted or to be appended, these graphically performed manipulations if necessary being transformed automatically into Java Script objects (5a).

20. A printer, characterized in that it has a system for the transformation of digital print data streams as claimed in claim 17.

21. A printer server, characterized in that it has a system for the transformation of digital print data streams as claimed in claim 17.

22. A computer-readable medium having stored thereon instructions to cause a processor to execute a method, the method comprising:

(i) an input print data stream (2) is read in,

(ii) this is analyzed by means of a parser (4) for graphically representable objects (5) and is split up into these graphically representable objects (5), and

(iii) the graphically representable objects (5) are stored in a memory (6) in an object-oriented format,

(iv) the graphically representable objects (5) stored in the memory (6) in an object-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and

(v) the objects thus transformed are combined into an output print data stream (10) and are output,

characterized in that graphically representable objects (5, 5a) are stored in the memory (6) in an object-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

23. The computer-readable medium as claimed in claim 22, the method characterized in that the graphically representable objects (5, 5a) are combined into super-objects of higher complexity before being stored in the memory (6).

24. The computer-readable medium as claimed in claim 22, the method characterized in that feedback messages (11) referring to the output print data stream (10) output are read in and are analyzed for error messages which indicate that the output device (9), preferably the printer, has recognized a transformed graphic object in the output print data stream (10) which cannot be output by said printer, this graphic object is then split up into part objects of lower complexity, and the part objects thus obtained, in the format for the control of the output device (9), are slipped into the output print data stream (10) which is output to the output device (9).

25. The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment.

26. The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data

12

from web pages from the Internet, data from XML documents or else e-mails.

27. The computer-readable medium as claimed in claim 26, the method characterized in that the script (5a) automatically receiving data also requests this data automatically.

28. The computer-readable medium as claimed in claim 26, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with itself, and prints out the graphic object (5) assigned to itself together with the data requested, received and reassigned by itself.

29. The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically sends data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

30. The computer-readable medium as claimed in claim 29, the method characterized in that the script (5a) sends the graphic object (5) associated with itself to a receiver.

31. The computer-readable medium as claimed in claim 30, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with it, and forwards the graphic object (5) associated with itself to a receiver together with the data requested, received and reassigned by itself.

32. The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which is executed in the case of the output of the object (5) defined in the script (5a).

33. The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a), at least one case relating to the execution of the script (5a) being defined in the respective script (5a), and occurring automatically, preferably without further influence from outside.

34. The computer-readable medium as claimed in claim 33, the method characterized in that the automatically occurring case, defined at least in the respective script (5a), relating to the execution of the script (5a) is configured as a timer, that is to say as a case which occurs automatically as a result of expiry of time.

35. The computer-readable medium as claimed in claim 34, the method characterized in that the timer operates cyclically, that is to say it starts itself again upon expiry.

36. The computer-readable medium as claimed in claim 22, the method characterized in that Java Script is used as a formal language for the scripts.

37. The computer-readable medium as claimed in claim 22, the method characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.

38. A computer data signal embodied in a carrier wave and representing sequences of instructions which, when executed by a processor, cause the processor to perform a method, the method comprising:

US 6,684,789 B2

13

(i) an input print data signal (2) is read in,

(ii) this is analyzed by means of a parser (4) for graphically representable objects (5) and is split up into these graphically representable objects (5), and

(iii) the graphically representable objects (5) are stored in a memory (6) in an object-oriented format,

(iv) the graphically representable objects (5) stored in the memory (6) in an object-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and

(v) the objects thus transformed are combined into an output print data stream (10) and are output,

characterized in that graphically representable objects (5, 5a) are stored in the memory (6) in an object-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

39. The computer data signal as claimed in claim 38, the method characterized in that the graphically representable objects (5, 5a) are combined into super-objects of higher complexity before being stored in the memory (6).

40. The computer data signal as claimed in claim 38, the method characterized in that feedback messages (11) referring to the output print data stream (10) output are read in and are analyzed for error messages which indicate that the output device (9), preferably the printer, has recognized a transformed graphic object in the output print data stream (10) which cannot be output by said printer, this graphic object is then split up into part objects of lower complexity, and the part objects thus obtained, in the format for the control of the output device (9), are slipped into the output print data stream (10) which is output to the output device (9).

41. The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment.

42. The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

43. The computer data signal as claimed in claim 42, the method characterized in that the script (5a) automatically receiving data also requests this data automatically.

44. The computer data signal as claimed in claim 42, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with itself, and prints out the graphic object (5) assigned to

14

itself together with the data requested, received and reassigned by itself.

45. The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically sends data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

46. The computer data signal as claimed in claim 45, the method characterized in that the script (5a) sends the graphic object (5) associated with itself to a receiver.

47. The computer data signal as claimed in claim 46, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with it, and forwards the graphic object (5) associated with itself to a receiver together with the data requested, received and reassigned by itself.

48. The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which is executed in the case of the output of the object (5) defined in the script (5a).

49. The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a), at least one case relating to the execution of the script (5a) being defined in the respective script (5a), and occurring automatically, preferably without further influence from outside.

50. The computer data signal as claimed in claim 49, the method characterized in that the automatically occurring case, defined at least in the respective script (5a), relating to the execution of the script (5a) is configured as a timer, that is to say as a case which occurs automatically as a result of expiry of time.

51. The computer data signal as claimed in claim 50, the method characterized in that the timer operates cyclically, that is to say it starts itself again upon expiry.

52. The computer data signal as claimed in claim 38, the method characterized in that Java Script is used as a formal language for the scripts.

53. The computer data signal as claimed in claim 38, the method characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.

*    *    *    *    *

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 02/03/2004 | 6684789 | 60428.00001 | 5658 |

30256      7590      01/15/2004

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA  94304-1043

DATES ENTERED _____

*No Action*

JAN 2 0 2004

## ISSUE NOTIFICATION

CALENDARED

The projected patent number and issue date are specified above.

BY _____ *Amy*
ATTORNEY _____
    SQUIRE, SANDERS & DEMPSEY

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 0 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) system (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (703) 305-1383. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

APPLICANT(S):

Thomas Krautter, Stuttgart, GERMANY;

| Date Mailed: November 3, 2003 | By: AW/sav | PTO DATE STAMP: |
|---|---|---|
| Serial No.: 10/275,784 | | |
| Applicant: Thomas Krautter | | Docket No.: 60428.00001 |

Title: METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER

The following has been received in the U.S. Patent Office on the date stamped hereon:

☐ Patent Application __ Pages __ Claims
☐ Drawings Formal __ Sheets
☐ Oath/Declaration/Power of Attorney
☐ Assignment & Recordation Cover Sheet
☐ Verified Statement Claiming Small Entity Status
☐ Supplemental Info. Disclosure Statement & PTO-1449 / Refs __
☐ Provisional Application _____ Pages
☒ Authorization to Charge Deposit Account No. 05-0150 ($1330 Issue Fee & $300 Publication Fee)
☒ Certificate(s) of First Class Mailing

☐ Amendment/Response
☐ Petition for Extension of Time
☒ Transmittal Form
☐ Notice of Appeal
☐ Fee Transmittal for FY 2002 (in duplicate)
☒ PTOL-85 Issue Fee Transmittal (in duplicate)

☐ Copy of PTO-1533, Notice to File Missing Parts
☐ Check No. _____ for $ _____

U.S DEPARTMENT OF COMMERCE
PATENT/TRADEMARK OFFICE
WASHINGTON, D.C. 20231



**Squire, Sanders & Dempsey L.L.P.**
600 Hansen Way, Suite 100
Palo Alto, CA 94304-1043

PTO/SB/21 (05-03)
Approved for use through 04/30/2003. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TRANSMITTAL FORM<br>*(to be used for all correspondence after initial filing)* | Application Number | 10/275,784 |
|---|---|---|
| | Filing Date | November 7, 2002 |
| | First Named Inventor | Thomas Krautter |
| | Art Unit | 2854 |
| | Examiner Name | Chau, Minh H. |
| Total Number of Pages in This Submission | 3 | Attorney Docket Number | 60428.00001 |

### ENCLOSURES *(check all that apply)*

| | | |
|---|---|---|
| ☐ Fee Transmittal Form | ☐ Assignment and Recordation Cover Sheet *(for an Application)* | ☐ After Allowance Communication to Group |
| ☐ Request for Corrected Filing Receipt | ☐ Formal Drawings ____ Sheets | ☐ Appeal Communication to Board of Appeals and Interferences |
| ☐ Amendment / Response | ☐ Licensing-related Papers | ☐ Appeal Communication to Group *(Appeal Notice, Brief, Reply Brief)* |
|    ☐ After Final | ☐ Petition | ☐ Proprietary Information |
|    ☐ With RCE | ☒ PTOL-85 Issue Fee Transmittal (in duplicate) | ☒ Authorization to Charge Deposit Account No. 05-0150 ($1330 Issue Fee & $300 Publication Fee) |
| ☐ Extension of Time Request | ☐ Letter to the Official Draftsperson (Submission of Formal Drawings) | ☐ Other Enclosure(s) *(please identify below)*: |
| ☐ Return Postcard | ☐ Terminal Disclaimer | |
| ☐ IDS and Form 1449 | ☐ Request for Refund | |
| ☐ Certified Copy of Priority Document(s) | ☐ CD, Number of CD(s) _____ | |
| ☐ Response to Missing Parts/ Incomplete Application | Remarks | |
| ☐ Declaration/Oath | | |

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| Firm or Individual name | Aaron Wininger, Reg. No. 45,229<br>Squire, Sanders & Dempsey L.L.P.<br>600 Hansen Way<br>Palo Alto, CA 94304-1043 |
|---|---|
| Signature | |
| Date | November 3, 2003 |

### CERTIFICATE OF MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below.

| Typed or printed name | Aaron Wininger | | |
|---|---|---|---|
| Signature | | Date | November 3, 2003 |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), to: <u>Mail</u>

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or <u>Fax</u> (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

| 30256 | 7590 | 10/07/2003 |

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA 94304-1043

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

Aaron Wininger _(Depositor's name)_
_(Signature)_
November 3, 2003 _(Date)_

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 11/07/2002 | Thomas Krautter | 60428.00001 | 5658 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1330 | $300 | $1630 | 01/07/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| CHAU, MINH H | 2854 | 101-484000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 Squire, Sanders &
  Dempsey L.L.P.
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE
CCP Systems AG

(B) RESIDENCE: (CITY and STATE OR COUNTRY)
Stuttgart, Germany

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ individual  ☒ corporation or other private group entity  ☐ government

4a. The following fee(s) are enclosed:
☒ Issue Fee
☒ Publication Fee
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):
☐ A check in the amount of the fee(s) is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☒ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number 05-0150 (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

(Authorized Signature) _____  (Date) 11/3/03

Aaron Wininger, Reg. No. 45,229

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.



PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), to: **Mail**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or **Fax**    (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

30256    7590    10/07/2003

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA 94304-1043

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

| Aaron Wininger | (Depositor's name) |
| | (Signature) |
| November 3, 2003 | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 11/07/2002 | Thomas Krautter | 60428.00001 | 5658 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1330 | $300 | $1630 | 01/07/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| CHAU, MINH H | 2854 | 101-484000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  Squire, Sanders & Dempsey L.L.P.

2

3

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

CCP Systems AG

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Stuttgart, Germany

Please check the appropriate assignee category or categories (will not be printed on the patent):   ☐ individual   ☒ corporation or other private group entity   ☐ government

4a. The following fee(s) are enclosed:

☒ Issue Fee
☒ Publication Fee
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☒ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number 05-0150 (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

(Authorized Signature)    (Date) 11/3/03

Aaron Wininger, Reg. No. 45,229

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

DATES ENTERED

# NOTICE OF ~~ALLOWANCE AND~~ FEE(S) DUE
Issue Fee Due
1/7/2004

| | | |
|---|---|---|
| 30256 | 7590 | 10/07/2003 |

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA 94304-1043

OCT 1 0 2003

CALENDARED

BY _____
ATTORNEY
SQUIRE, SANDERS & DEMPSEY

| EXAMINER |
|---|
| CHAU, MINH H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2854 | |

DATE MAILED: 10/07/2003

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 11/07/2002 | Thomas Krautter | 60428.00001 | 5658 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1330 | $300 | $1630 | 01/07/2004 |

THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (OR AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS ABANDONED.

HOW TO REPLY TO THIS NOTICE:

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status is changed, pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above and notify the United States Patent and Trademark Office of the change in status, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check the box below and enclose the PUBLICATION FEE and 1/2 the ISSUE FEE shown above.

☐ Applicant claims SMALL ENTITY status.
See 37 CFR 1.27.

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), to: **Mail**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or **Fax** (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

30256    7590    10/07/2003

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA 94304-1043

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 11/07/2002 | Thomas Krautter | 60428.00001 | 5658 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR THE TRANSFORMATION OF DIGITAL PRINT DATA STREAMS AND CORRESPONDING PRINTER AND PRINTER SERVER

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1330 | $300 | $1630 | 01/07/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| CHAU, MINH H | 2854 | 101-484000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use a Customer Number is required.

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1. _____

2. _____

3. _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE              (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent):   ☐ individual   ☐ corporation or other private group entity   ☐ government

4a. The following fee(s) are enclosed:
☐ Issue Fee
☐ Publication Fee
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):
☐ A check in the amount of the fee(s) is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

_____ (Authorized Signature)          _____ (Date)

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 11/07/2002 | Thomas Krautter | 60428.00001 | 5658 |

30256    7590    10/07/2003

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA 94304-1043

| EXAMINER |
|---|
| CHAU, MINH H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2854 | |

DATE MAILED: 10/07/2003

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 0 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 0 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) system (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (703) 305-1383. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/275,784 | 11/07/2002 | Thomas Krautter | 60428.00001 | 5658 |

| | | |
|---|---|---|
| 30256 | 7590 | 10/07/2003 |

SQUIRE, SANDERS & DEMPSEY L.L.P
600 HANSEN WAY
PALO ALTO, CA 94304-1043

| EXAMINER |
|---|
| CHAU, MINH H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2854 | |

DATE MAILED: 10/07/2003

### Notice of Fee Increase on October 1, 2003

If a reply to a "Notice of Allowance and Fee(s) Due" is filed in the Office on or after October 1, 2003, then the amount due will be higher than that set forth in the "Notice of Allowance and Fee(s) Due" since there will be an increase in fees effective on October 1, 2003. See Revision of Patent Fees for Fiscal Year 2004; Final Rule, 68 Fed. Reg. 41532, 41533, 41534 (July 14, 2003).

The current fee schedule is accessible from (http://www.uspto.gov/main/howtofees.htm).

If the fee paid is the amount shown on the "Notice of Allowance and Fee(s) Due" but not the correct amount in view of the fee increase, a "Notice of Pay Balance of Issue Fee" will be mailed to applicant. In order to avoid processing delays associated with mailing of a "Notice of Pay Balance of Issue Fee," if the response to the Notice of Allowance is to be filed on or after October 1, 2003 (or mailed with a certificate of mailing on or after October 1, 2003), the issue fee paid should be the fee that is required at the time the fee is paid. If the issue fee was previously paid, and the response to the "Notice of Allowance and Fee(s) Due" includes a request to apply a previously-paid issue fee to the issue fee now due, then the difference between the issue fee amount at the time the response is filed and the previously-paid issue fee should be paid. See Manual of Patent Examining Procedure, Section 1308.01 (Eighth Edition, August 2001).

Effective October 1, 2003, 37 CFR 1.18 is amended by revising paragraphs (a) through (c) to read as set forth below.

Section 1.18 Patent post allowance (including issue) fees.

(a) Issue fee for issuing each original or reissue patent, except a design or plant patent:
    By a small entity (Sec. 1.27(a))...................... $665.00
    By other than a small entity.......................... $1,330.00

(b) Issue fee for issuing a design patent:
    By a small entity (Sec. 1.27(a))...................... $240.00
    By other than a small entity.......................... $480.00

(c) Issue fee for issuing a plant patent:
    By a small entity (Sec. 1.27(a))...................... $320.00
    By other than a small entity.......................... $640.00

Questions relating to issue and publication fee payments should be directed to the Customer Service Center of th Office of Patent Publication at (703) 305-8283.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Notice of Allowability*** | 10/275,784 | KRAUTTER, THOMAS |
| | **Examiner** | **Art Unit** | |
| | Minh H Chau | 2854 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the Application filed on 07November 2002*.

2. ☒ The allowed claim(s) is/are *1-53*.

3. ☒ The drawings filed on *07 November 2002* are accepted by the Examiner.

4. ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☒ All   b) ☐ Some*   c) ☐ None   of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☒ Copies of the certified copies of the priority documents have been received in this national stage application from the
         international Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

5. ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

    (a) ☐ The translation of the foreign language provisional application has been received.

6. ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

7. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

  ☐ CORRECTED DRAWINGS must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No. ____ .

    (b) ☐ including changes required by the proposed drawing correction filed _____ , which has been approved by the Examiner.

    (c) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No. _____ .

**identifying indicia** such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet.

9. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1☒ Notice of References Cited (PTO-892)
2☐ Notice of Informal Patent Application (PTO-152)
3☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
4☐ Interview Summary (PTO-413), Paper No.____ .
5☒ Information Disclosure Statements (PTO-1449), Paper No. *2*.
6☐ Examiner's Amendment/Comment
7☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material
8☒ Examiner's Statement of Reasons for Allowance
9☐ Other

| *Notice of References Cited* | Application/Control No. 10/275,784 | Applicant(s)/Patent Under Reexamination KRAUTTER, THOMAS | |
| | Examiner Minh H Chau | Art Unit 2854 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-5,566,278 | 10-1996 | Patel et al. | 358/1.15 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

PTO/SB/08A (10-01)
Approved .. through 10/31/2002, OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449A/PTO | | | Complete if Known | |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT·BY APPLICANT** | | | Application Number | ~~Unknown~~ 10/275,784 |
| | | | Filing Date | November 7, 2002 |
| | | | First Named Inventor | Thomas Krautter |
| | | | Group Art Unit | ~~Unknown~~ 2854 |
| *(use as many sheets as necessary)* | | | Examiner Name | ~~Unknown~~ MINH CHAU |
| Sheet | 1 | of | 1 | Attorney Docket Number | 60428.00001 |

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number | | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | | Number - Kind Code[4] *(if known)* | | | | |
| MC | | US-5,218,754 | | 06-01-1993 | Kitty Sathi, et al. | |
| MC | | US-6,006,013 | | 12-21-1999 | David E. Rumph, et al. | |
| | | US- | | | | |
| | | US- | | | | |
| | | US- | | | | |
| | | US- | | | | |
| | | US- | | | | |
| | | US- | | | | |
| | | US- | | | | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | Country Code[3] - Number[4] - Kind Code[5] | | | | |
| MC | | EP - 0 109 615 - B1 | 06-01-1994 | International Business Machines Corporation | | |
| MC | | EP - 0 964 339 - A2 | 12-15-1999 | NEC Corporation | | |
| MC | | EP - 1 061 456 - A2 | 12-20-2000 | NEC Corporation | | |
| MC | | GB - 2 357 348 - A | 06-20-2001 | International Business Machines Corporation | | |
| MC | | WO - 00/17748 | 03-30-2000 | Netcreate Systems, Inc. | | |
| MC | | WO - 00/55720 | 09-21-2000 | Prout AG | | |
| | | | | | | |
| | | | | | | |

| Examiner Signature | MINH CHAU | Date Considered | 09-24-03 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] Applicant's unique citation designation number (optional). [2] See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3] Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST. 16 if possible. [6] Applicant is to place a check mark here if English language Translation is attached.

Burden Hour Statement: This form is estimated to take 2.0 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

Application/Control Number: 10/275,784                                      Page 2
Art Unit: 2854

## REASONS FOR ALLOWANCE

1.    The following is an examiner's statement of reasons for allowance:

Claims 1-53 have been indicated for allowance because the prior art fails to teach the

entire combination of a method for the transformation of digital print data stream including a

steps of reading an input print data stream, analyzing the input data stream by means of a parser

and splitting the input data into the graphically representable objects, storing the graphically

representable objects in a memory in an object-oriented format, transforming the object-oriented

format into a format for controlling a printer, the object-oriented format stored in the memory

including at least one stored script is assigned, which is executed in the case defined in the script.

2.    Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

3.    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Minh H Chau whose telephone number is (703) 305-0298. The

examiner can normally be reached on M - TH.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Andrew H Hirshfeld can be reached on (703) 305-6619. The fax phone number for

the organization where this application or proceeding is assigned is (703) 872-9306.

Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is (703) 308-0956.

MHC

September 30, 2003

ANDREW H. HIRSHFELD

<div style="border:1px solid">

**REVISED AMENDMENT PRACTICE:   37 CFR 1.121 CHANGED
COMPLIANCE IS MANDATORY  -   Effective Date: July 30, 2003**

</div>

All amendments filed on or after the effective date noted above must comply with revised 37 CFR 1.121. See Final Rule: **Changes To Implement Electronic Maintenance of Official Patent Application Records** (68 *Fed. Reg.* 38611 (June 30, 2003), posted on the Office's website at: http://www.uspto.gov/web/patents/ifw/ with related information. The amendment practice set forth in revised 37 CFR 1.121, and described below, replaces the voluntary revised amendment format available to applicants since February 2003. **NOTE: STRICT COMPLIANCE WITH THE REVISED 37 CFR 1.121 IS REQUIRED AS OF THE EFFECTIVE DATE (July 30, 2003)**. The Office will notify applicants of amendments that are not accepted because they do not comply with revised 37 CFR 1.121 via a Notice of Non-Compliant Amendment. See MPEP 714.03 (Rev. 1, Feb. 2003). The non-compliant section(s) will have to be corrected and the entire corrected section(s) resubmitted within a set period.

*__Bold underlined italic font has been used below to highlight the major differences between the revised 37 CFR 1.121 and the voluntary revised amendment format that applicants could use since February, 2003.__*
Note: The amendment practice for reissues and reexamination proceedings, except for drawings, has not changed.

<div align="center">

**REVISED AMENDMENT PRACTICE**

</div>

**I. Begin each section of an amendment document on a separate sheet:**
Each section of an amendment document (*e.g.*, Specification Amendments, Claim Amendments, Drawing Amendments, and Remarks) must begin on a separate sheet. Starting each separate section on a new page will facilitate the process of separately indexing and scanning each section of an amendment document for placement in an image file wrapper.

**II. Two versions of amended part(s) no longer required:**
37 CFR 1.121 has been revised to no longer require two versions (a clean version and a marked up version) of each replacement paragraph or section, or amended claim. Note, however, the requirements for a clean version and a marked up version for substitute specifications under 37 CFR 1.125 have been retained.

**A) Amendments to the claims:**
Each amendment document that includes a change to an existing claim, cancellation of a claim or submission of a new claim, **must include a complete listing** of all claims in the application. After each claim number in the listing, the status must be indicated in a parenthetical expression, and **the text of each pending claim** (with markings to show current changes) must be presented. The claims in the listing will replace all prior claims in the application.

    (1) The current status of all of the claims in the application, including any previously canceled, not entered or withdrawn claims, must be given in a parenthetical expression following the claim number using only one of the following seven status identifiers: (original), (currently amended), (canceled), (withdrawn), (new), *__(previously presented) and (not entered)__*. The text of all pending claims, *__including withdrawn claims,__* must be submitted each time any claim is amended. Canceled *__and not entered__* claims must be indicated by only the claim number and status, without presenting the text of the claims.

    (2) The text of all claims being currently amended must be presented in the claim listing with markings to indicate the changes that have been made relative to the immediate prior version. The changes in any amended claim must be shown by underlining (for added matter) or strikethrough (for deleted matter) with 2 exceptions:  (1) for *__deletion of five characters or fewer, double brackets may be used (e.g., [[eroor]]); and (2) if strikethrough cannot be easily perceived (e.g., deletion of the number "4" or certain punctuation marks), double brackets must be used (e.g., [[4]]). As an alternative to using double brackets, however, extra portions of text may be included before and after text being deleted, all in strikethrough, followed by including and underlining the extra text with the desired change__* (e.g., ~~number 4 as~~ number 14 as). An accompanying clean version is not required and should not be presented. Only claims of the status "currently amended," and "withdrawn" that are being amended, may include markings.

    (3) The text of pending claims not being currently amended, *__including withdrawn claims,__* must be presented in the claim listing in clean version, *i.e.*, without any markings. Any claim text presented in clean version will constitute an assertion that it has not been changed relative to the immediate prior version except to omit

# The United States Patent and Trademark Office has changed certain mailing addresses!

### Effective May 1, 2003

Use the address provided in this flyer after May 1, 2003 for any correspondence with the United States Patent and Trademark Office (USPTO) in patent-related matters to organizations reporting to the Commissioner for Patents.

**DO NOT USE** the Washington DC 20231 and P.O. Box 2327 Arlington, VA 22202 addresses after May 1, 2003 for **any correspondence** with the USPTO even if these old addresses are indicated in the accompanying Office action or Notice or in any other action, notice, material, form, instruction or *other* information.

Correspondence in patent-related matters to organizations reporting to the Commissioner for Patents must now be addressed to:



**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**



## Special Mail Stop designations to replace Special Box designations

Also effective May 1, 2003, the USPTO is changing the special Box designations for Patents and Trademarks to corresponding Mail Stop designations (*e.g.*, "Box 4" will now be "Mail Stop 4").

For further information, see *Correspondence with the United States Patent and Trademark Office*, 68 *Fed. Reg.* 14332 (March 25, 2003). A copy of the *Federal Register* notice is available on the USPTO's web site at http://www.uspto.gov/web/menu/current.html#register

A listing of specific USPTO mailing addresses (See Patents – specific) will be available on the USPTO's web site on April 15, 2003 at http://www.uspto.gov/main/contacts.htm

Persons filing correspondence with the Office should check the rules of practice, the Official Gazette, or the Office's Internet Web site (www.uspto.gov) to determine the appropriate address and Mail Stop Designation (if applicable) for all correspondence being delivered to the USPTO via the United States Postal Service (USPS).

Questions regarding the content of this flyer should be directed to the Inventor Assistance Center at (703) 308-4357 or toll-free at 1-800-786-9199.

## ALLOWED CLAIMS

For U.S. Patent Application No. 10/275,784
Filed November 7, 2002
Entitled: Method and System for the Transformation
of Digital Print Data Streams and Corresponding Printer and Printer Server
Inventor: Thomas Krautter

1.    A method for the transformation of digital print data streams, in which

(i)    an input print data stream (2) is read in,

(ii)    this is analyzed by means of a parser (4) for graphically representable objects (5) and is split up into these graphically representable objects (5), and

(iii)    the graphically representable objects (5) are stored in a memory (6) in an object-oriented format, and

(iv)    the graphically representable objects (5) stored in the memory (6) in an objected-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and

(v)    the objects thus transformed are combined into an output print data stream (10) and are output,

characterized in that graphically representable objects (5, 5a) are stored in the memory (6) in an objected-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

2.    The method as claimed in claim 1, characterized in that the graphically representable objects (5, 5a) are combined into super-objects of higher complexity before being stored in the memory (6).

3.    The method as claimed in claim 1, characterized in that feedback messages (11) referring to the output print data stream (10) output are read in and are analyzed for error messages which indicate that the output device (9), preferably the printer, has recognized a transformed graphic object in the output print data stream (10) which cannot be output by said printer, this graphic object is then split up into part objects of lower complexity, and

the part objects thus obtained, in the format for the control of the output device (9), are slipped into the output print data stream (10) which is output to the output device (9).

4.     The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment.

5.     The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

6.     The method as claimed in claim 5, characterized in that the script (5a) automatically receiving data also requests this data automatically.

7.     The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically sends data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

8.     The method as claimed in claim 7, characterized in that the script (5a) sends the graphic object (5) associated with itself to a receiver.

9.     The method as claimed in claim 8, characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with it, and forwards the graphic object (5) associated with itself to a receiver together with the data requested, received and reassigned by itself.

10.    The method as claimed in claim 5, characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with itself, and prints out the graphic object (5) assigned to itself together with the data requested, received and reassigned by itself.

11.    The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which is executed in the case of the output of the object (5) defined in the script (5a).

12.    The method as claimed in claim 1, characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a), at least one case relating to the execution of the script (5a) being defined in the respective script (5a), and occurring automatically, preferably without further influence from outside.

13.    The method as claimed in claim 12, characterized in that the automatically occurring case, defined at least in the respective script 5(a), relating to the execution of the script (5a) is configured as a timer, that is to say as a case which occurs automatically as a result of expiry of time.

14.    The method as claimed in claim 13, characterized in that the timer operates cyclically, that is to say it starts itself again upon expiry.

15.    The method as claimed in claim 1, characterized in that Java Script is used as a formal language for the scripts.

16.    The method as claimed in claim 1, characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print

data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.

17.    A system for the transformation of digital print data streams comprising at least one data processing unit having at least one memory and at least one communications interface, characterized in that the data processing unit is programmed in such a way that it operates in accordance with the method as claimed in claim 1.

18.    The system for the transformation of digital print data streams as claimed in claim 17, the system also has an operating station with display means (8) and input means, which makes it possible for the graphically representable objects (5) stored in the memory (6) of the data processing unit in an object-oriented format, preferably also script objects (5a), to be read out via the application interface (7), to be changed, to be deleted or to be appended, preferably before they are output in the output print data stream (10).

19.    The system for the transformation of digital print data streams as claimed in claim 17, wherein the data processing unit permits respectively stored objects, preferably also Java Script objects (5a) themselves, to be read out graphically, to be changed, to be deleted or to be appended, these graphically performed manipulations if necessary being transformed automatically into Java Script objects (5a).

20.    A printer, characterized in that it has a system for the transformation of digital print data streams as claimed in claim 17.

21.    A printer server, characterized in that it has a system for the transformation of digital print data streams as claimed in claim 17.

22.    A computer-readable medium having stored thereon instructions to cause a processor to execute a method, the method comprising:

      (i)       an input print data stream (2) is read in,

(ii)    this is analyzed by means of a parser (4) for graphically representable objects (5) and is split up into these graphically representable objects (5), and

(iii)    the graphically representable objects (5) are stored in a memory (6) in an object-oriented format,

(iv)    the graphically representable objects (5) stored in the memory (6) in an object-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and

(v)    the objects thus transformed are combined into an output print data stream (10) and are output,

characterized in that graphically representable objects (5, 5a) are stored in the memory (6) in an object-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

23.    The computer-readable medium as claimed in claim 22, the method characterized in that the graphically representable objects (5, 5a) are combined into super-objects of higher complexity before being stored in the memory (6).

24.    The computer-readable medium as claimed in claim 22, the method characterized in that

feedback messages (11) referring to the output print data stream (10) output are read in and are analyzed for error messages which indicate that the output device (9), preferably the printer, has recognized a transformed graphic object in the output print data stream (10) which cannot be output by said printer,

this graphic object is then split up into part objects of lower complexity, and

the part objects thus obtained, in the format for the control of the output device (9), are slipped into the output print data stream (10) which is output to the output device (9).

25.    The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the

object-oriented format is assigned at least one script (5a) which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment.

26.    The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

27.    The computer-readable medium as claimed in claim 26, the method characterized in that the script (5a) automatically receiving data also requests this data automatically.

28.    The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically sends data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

29.    The computer-readable medium as claimed in claim 28, the method characterized in that the script (5a) sends the graphic object (5) associated with itself to a receiver.

30.    The computer-readable medium as claimed in claim 29, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with it, and forwards the graphic object (5) associated with itself to a receiver together with the data requested, received and reassigned by itself.

31.    The computer-readable medium as claimed in claim 26, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5)

associated with itself, and prints out the graphic object (5) assigned to itself together with the data requested, received and reassigned by itself.

32.    The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which is executed in the case of the output of the object (5) defined in the script (5a).

33.    The computer-readable medium as claimed in claim 22, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a), at least one case relating to the execution of the script (5a) being defined in the respective script (5a), and occurring automatically, preferably without further influence from outside.

34.    The computer-readable medium as claimed in claim 33, the method characterized in that the automatically occurring case, defined at least in the respective script (5a), relating to the execution of the script (5a) is configured as a timer, that is to say as a case which occurs automatically as a result of expiry of time.

35.    The computer-readable medium as claimed in claim 34, the method characterized in that the timer operates cyclically, that is to say it starts itself again upon expiry.

36.    The computer-readable medium as claimed in claim 22, the method characterized in that Java Script is used as a formal language for the scripts.

37.    The computer-readable medium as claimed in claim 22, the method characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.

38.    A computer data signal embodied in a carrier wave and representing sequences of instructions which, when executed by a processor, cause the processor to perform a method, the method comprising:

(i)     an input print data stream (2) is read in,

(ii)    this is analyzed by means of a parser (4) for graphically representable objects (5) and is split up into these graphically representable objects (5), and

(iii)   the graphically representable objects (5) are stored in a memory (6) in an object-oriented format,

(iv)    the graphically representable objects (5) stored in the memory (6) in an object-oriented format are transformed into a format for the control of an output device (9), preferably a printer, and

(v)     the objects thus transformed are combined into an output print data stream (10) and are output,

characterized in that graphically representable objects (5, 5a) are stored in the memory (6) in an object-oriented format, to which at least one stored script is assigned, which is executed in the cases defined in the script.

39.    The computer data signal as claimed in claim 38, the method characterized in that the graphically representable objects (5, 5a) are combined into super-objects of higher complexity before being stored in the memory (6).

40.    The computer data signal as claimed in claim 38, the method characterized in that feedback messages (11) referring to the output print data stream (10) output are read in and are analyzed for error messages which indicate that the output device (9), preferably the printer, has recognized a transformed graphic object in the output print data stream (10) which cannot be output by said printer, this graphic object is then split up into part objects of lower complexity, and

the part objects thus obtained, in the format for the control of the output device (9), are slipped into the output print data stream (10) which is output to the output device (9).

41.    The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which controls external devices, preferably archiving devices, folding systems, enveloping systems or security equipment.

42.    The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically receives data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

43.    The computer data signal as claimed in claim 42, the method characterized in that the script (5a) automatically receiving data also requests this data automatically.

44.    The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which automatically sends data, preferably data organized in an object-oriented manner, image data, text data or data from web pages from the Internet, data from XML documents or else e-mails.

45.    The computer data signal as claimed in claim 44, the method characterized in that the script (5a) sends the graphic object (5) associated with itself to a receiver.

46.    The computer data signal as claimed in claim 45, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated

with it, and forwards the graphic object (5) associated with itself to a receiver together with the data requested, received and reassigned by itself.

47.    The computer data signal as claimed in claim 42, the method characterized in that the script (5a) in turn reassigns the data received by it to the graphic object (5) associated with itself, and prints out the graphic object (5) assigned to itself together with the data requested, received and reassigned by itself.

48.    The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a) which is executed in the case of the output of the object (5) defined in the script (5a).

49.    The computer data signal as claimed in claim 38, the method characterized in that at least one graphically representable object (5) stored in the memory (6) in the object-oriented format is assigned at least one script (5a), at least one case relating to the execution of the script (5a) being defined in the respective script (5a), and occurring automatically, preferably without further influence from outside.

50.    The computer data signal as claimed in claim 49, the method characterized in that the automatically occurring case, defined at least in the respective script (5a), relating to the execution of the script (5a) is configured as a timer, that is to say as a case which occurs automatically as a result of expiry of time.

51.    The computer data signal as claimed in claim 50, the method characterized in that the timer operates cyclically, that is to say it starts itself again upon expiry.

52.    The computer data signal as claimed in claim 38, the method characterized in that Java Script is used as a formal language for the scripts.

53.    The computer data signal as claimed in claim 38, the method characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.

PaloAlto/59742.1

53.     The computer data signal as claimed in claim 38, the method characterized in that the graphically representable objects (5) stored in the memory (6) in an object-oriented format, preferably also script objects (5a), preferably before they are output in the output print data stream (10), are kept ready by an application interface (7) to be read out, to be changed, to be deleted or to have new objects (5) appended.



UNITED STATES
PATENT AND
★★★★ TRADEMARK OFFICE

SEPTEMBER 08, 2003

PTAS

SQUIRE, SANDERS & DEMPSEY, L.L.P.
AARON WININGER, ESQ.
600 HANSEN WAY
PALO ALTO, CA 94304-1043

Deputy Under Secretary of Commerce For Intellectual Property and
Deputy Director of the United States Patent and Trademark Office
Washington, DC 20231
www.uspto.gov


*102419756A*

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.

RECORDATION DATE: 11/07/2002

REEL/FRAME: 013942/0250
NUMBER OF PAGES: 3

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
    KRAUTTER, THOMAS

DOC DATE: 10/05/2002

ASSIGNEE:
    CCP SYSTEMS AG
    HELLMUTH-HIRTH-STR. 9
    STUTTGART, FED REP GERMANY 70435

SERIAL NUMBER: 10275784
PATENT NUMBER:

FILING DATE: 11/07/2002
ISSUE DATE:

DATES ENTERED _____

_No Action_

THERESA FREDERICK, EXAMINER
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

SEP 1 1 2003

CALENDARED _lnl_
BY _____
ATTORNEY _____
SQUIRE, SANDERS & DEMPSEY

**10/275784**

EXPRESS MAIL LABEL NO.: EL 701 318 593 US

A/2 581-40

DT12 Rec'd PCT/PTO  0 7 NOV 2002
Attorney Docket No. 60428.00001

| Form PTO-1595 | RECORDATION FORM | U.S. DEPARTMENT OF COMMERCE |
|---|---|---|
| (Rev. 10/02) | 04-15-2003 | U.S. Patent and Trademark Office |
| OMB No. 0651-0027 (exp. 6/30/2005) | | |

Tab settings ⇨ ⇨ ⇨   ▼   ▼

102419756

▼   ▼   ▼

To the Honorable Commissioner of Pa

I original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies) |
|---|---|
| Thomas Krautter | Name: CCP SYSTEMS AG |
| | Internal Address: |
| 11-7-02 | |
| Additional name of conveying party(ies) attached? ☐ Yes ☒ No | Street Address: Hellmuth-Hirth-Str. 9 |
| 3. Nature of conveyance: | City: Stuttgart    Country: Germany Zip: 70435 |
| ☒ Assignment    ☐ Merger | Additional Name(s) & address(es) attached? ☐ Yes ☒ No |
| ☐ Security Agreement    ☐ Change of Name | |
| ☐ Other _____ | |
| Execution Date: October 5, 2002 | |

4. Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is: October 5, 2002

A. Patent Application No.(s)    B. Patent No.(s)

10275784

Additional numbers attached? ☐ Yes ☒ No

| 5. Name and address of party to whom correspondence concerning this document should be mailed: | 6. Total number of applications and patents involved: ☐1 |
|---|---|
| Name: Aaron Wininger, Esq. | 7. Total fee (37 CFR 3.41) . . . . . . .$ 40.00 |
| Internal Address: Squire, Sanders & Dempsey, L.L.P. | ☐ Enclosed |
| | ☒ Authorized to be charged to deposit account |
| 11/14/2002 SNAJARRO 00000132 050150   10275784 | |
| 04 FC:8021    40.00 CH | 8. Deposit account number: |
| Street Address: 600 Hansen Way | 05-0150 |
| City: Palo Alto    State: CA    Zip: 94304-1043 | (Attach duplicate copy of this page if paying by deposit account) |

DO NOT USE THIS SPACE

9. Statement and signature.

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

| Aaron Wininger, Reg. No. 45,229 | | November 7, 2002 |
|---|---|---|
| Name of Person Signing | Signature | Date |

Total number of pages including cover sheet, attachments, and documents: ☐

## ASSIGNMENT

*(1-4) Insert Name(s) of Inventor(s)*

(1) __Thomas Krautter__    (3) _____

(2) _____    (4) _____

For good and valuable consideration receipt of which is hereby acknowledged, the undersigned agree(s) to assign, and hereby do(es) assign, transfer and set over to:

*(9) Insert name of Assignee*    (9) CCP SYSTEMS AG _____

*(10) Insert state of incorporation of Assignee*    (10) Germany _____

*(11) Insert address of Assignee*    (11) of Hellmuth-Hirth-Str. 9, 70435 Stuttgart, Germany _____
(hereinafter designated as the Assignee) the entire worldwide right, title, interest, a patent applications and patents for every country, including divisions, reissues, continuations and all other extensions, rights and priorities in the invention known and subject matter contained in

*(12) Insert Identification of Invention, such as Title, Case Number or Foreign Application Number*    (12) __Method And System For The Transformation Of Digital Print Data Stream And Corresponding Printer And Printer Server__
for which the undersigned has (have) executed an application for patent in United States of America

*(13) Insert Date of Signing of Application*    (13) on __October 5, 2002__ _____

1)    The undersigned agree(s) to execute all papers necessary in connection with the application and any continuing division applications thereof and also to execute separate assignments in connection with such applications as the Assignee r deem necessary or expedient.

2)    The undersigned agree(s) to execute all papers necessary in connection with any interference which may be declared concerning this application or continuation or division thereof and to cooperate with the Assignee in every way possible in obtaining evidence and going forward with such interference.

3)    The undersigned agree(s) to execute all papers and documents and perform any act which may be necessary in connection with claims or provisions of the International Convention for Protection of Industrial Property or similar agreeme

4)    The undersigned agree(s) to perform all affirmative acts which may be necessary to obtain a grant of a valid United States patent to the Assignee.

5)    The undersigned hereby authorize(s) and request(s) the Commissioner for Patents and the duly constituted authorities of foreign countries to issue any and all Letters Patents resulting from said application or any division or division continuing or reissue applications thereof to the said Assignee, its successors and assigns, as Assignee of the entire right, title and interest, and hereby covenants that he has (they have) full right to convey the entire interest herein assigned, and that he (they have) not executed and will not execute, any agreement in conflict herewith.

6)    The undersigned hereby grant(s)

Marc A. Sockol, Reg. No. 40,823; Vidya R. Bhakar, Reg. No. 42,323; Daryl C. Josephson, Reg. No. 37,365; Cameron Kerrigan, Reg. No. 44,826; David B. Abel, Reg. No. 32,394; Nathan Lane, Reg. No. 43,738; Michael Lechter, Reg. No. 27,350; David Koo, Reg. No. 46,839; David Rogers, Reg. No. 38,287; William Bachand, Reg. No. 34,980; Aaron Wininger, Reg. No. 45,229; Paul A. Durdik, Reg. No. 37,819; Paul J. Meyer 47,791; Reg. No. 48,821; Victor Repkin, Reg. No. 45,039; Victoria L. Nicholson, Reg. No. 47,823; and Fariba Sirjani, Reg. No. 47,947.

-1-

the power to insert on this assignment any further identification which may be necessary or desirable in order to comply wit the rules of the United States Patent and Trademark Office for recordation of this document.

Date: 5.10.2002

Thomas Krautter

# EXHIBIT C

**WSCA/NASPO IBM SYSTEM p SOFTWARE**
**Update as of June 23, 2009**
**Price files maintained by Michelly Paula Mantovani**
SEARCHING - DEPENDING ON YOUR ADOBE VERSION, LOOK FOR THE BINOCULAR ICON OF FOR THE WORD "FIND."
USING EITHER, TYPE THE PRODUCT NUMBER AND THE SCREEN WILL SCROLL TO THE APPROPRIATE SECTION IN THE DOCUMENT.
Under the WSCA/NASPO contract, IBM's software is expected to be sold with hardware.
Certain exceptions such as the addition of staff or a roll out would allow for separate purchases.
Questions regarding the policy of linking hardware with software sale can be directed to the WSCA/NASPO
administrator in Minnesota, Bernie Kopischke at Bernie.Kopischke@state.mn.us

Prices contained herein are subject to change and do not contain any State & Local taxes,
if applicable for your area.  Please consult your IBM representative for current prices or
to verify tax implications or exemptions

Discount rates within product families may vary and some products eligible for sale
within the WSCA/NASPO product guidelines may have a zero discount

Prices based on configuration.
Prices are subject to change without notice.
See your IBM representative for exact configuration/pricng.

**TITLE 5639-JSI JSCRIBE INTELLIGENT SOFTWARE V1.2**

| MDL/ FEAT | FEATURE DESCRIPTION | LIST PRICE | WSCA Discount | WSCA Price |
|---|---|---|---|---|
| JSI | JSCRIBE INTELLIGENT SOFTWARE | $0.00 | 0.15 | $0.00 |
| 3746 | JSCRIBE 1-499 USERS W/1Y SWM | $8,000.00 | 0.15 | $6,800.00 |
| 3747 | JSCRIBE 500-1000 W/1 YR SWMA | $12,000.00 | 0.15 | $10,200.00 |
| 3748 | JSCRIBE 1001-2499 W/1 Y SWMA | $18,000.00 | 0.15 | $15,300.00 |
| 3749 | JSCRIBE 2500+ W/ 1 Y SWMA | $27,000.00 | 0.15 | $22,950.00 |

**TITLE 5639-NES SYSTEM P5 NETWORK E-MAIL SECURITY EXPRESS S(**

| MDL/ FEAT | FEATURE DESCRIPTION | LIST PRICE | WSCA Discount | WSCA Price |
|---|---|---|---|---|
| NES | IBM SECURE EMAIL EXP SOL SYS P | $0.00 | 0.15 | $0.00 |
| 3970 | 1-250  USER W 1Y SUB+SPT | $5.00 | 0.15 | $4.25 |
| 3971 | 251-500 USER W 1YR SUB+SPT | $4.00 | 0.15 | $3.40 |
| 3972 | 501-1000 USER MPP 1Y SUB+SPT | $3.00 | 0.15 | $2.55 |
| 3973 | >1000 USER W 1Y SUB+SPT | $2.00 | 0.15 | $1.70 |