NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CCP SYSTEMS AG, | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civil Action No. 09-CV-4354 (DMC) - |
| | : | (CCC) |
| SAMSUNG ELECTRONICS CORP., | : | |
| LTD., SAMSUNG ELECTRONICS | : | |
| AMERICA, INC., SAMSUNG | : | |
| NETWORKS, INC., and IBM | : | |
| CORPORATION, | : | |
| | | |
| Defendants. | | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion to dismiss Counts I and VI by Samsung Networks, Inc. ("Defendant Samsung Networks") for lack of personal jurisdiction and upon motion to dismiss by Samsung Electronics America, Inc. ("Defendant SEA") for lack of subject matter jurisdiction or, in the alternative, to compel arbitration and stay Count III of Plaintiff's Complaint pending arbitration.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure, no oral argument was heard.   After carefully considering all submissions, and based upon the following, the Court concludes that Defendant Samsung Networks' motion to dismiss is **denied without prejudice** pending jurisdictional discovery and Defendant SEA's motion to dismiss or, in the alternative, to stay litigation pending arbitration is **granted in part.**

I.   **BACKGROUND**[1]

    A.    Facts Relevant to Personal Jurisdiction

CCP Systems AG, ("CCP") is a corporation organized under the laws of Germany with its principal place of business in Stuttgart, Germany.  CCP develops, designs, manufactures, sells and distributes software for use in connection with printers and other computer-related devices.  In June 2004, CCP entered into a license agreement (the "IBM Agreement") with IBM Deutschland GmbH ("IBM Germany"), in turn, granting IBM Germany the authority to sublicense.  Consistent with that agreement, IBM Germany granted Samsung Electronics Co., Ltd. ("Samsung ECL") a sublicense. On May 25, 2009, CCP advanced written notice to IBM Germany terminating the IBM Agreement and the license granted therein. On July 15, 2009, a Samsung ECL Vice President, Mr. Chin Yoon, extended an email to certain Samsung ECL personnel and other Samsung affiliates acknowledging termination of the IBM Agreement.  Thereafter, CCP discovered infringing software available for download on Samsung ECL's website and other infringing spreadsheets containing hyperlinks for download.  On August 25, 2009, Plaintiff filed a Complaint before this Court alleging copyright and patent infringement.

Defendant Samsung Networks is a Korean corporation with a principal place of business in Seoul, Korea..  Samsung Networks is in the business of providing network and telecommunication services. Samsung Networks' cable lines for providing network and telecommunication services connect from Korea to the United States through a data center in Piscataway, New Jersey.  Samsung Networks owns, operates and has registered the domain name and website www.samsung.com,

---

[1]

These facts have been adopted from the parties' respective submissions.

including the subdomain www.downloadcenter.samsung.com.. Samsung Networks America, Inc., incorporated in California with offices in New Jersey, is a wholly owned subsidiary of Samsung Networks.    Samsung Networks America markets Samsung Networks' network and telecommunication services to customers in California, New Jersey, Texas and several other states. "SN America passes on 97 percent of the revenue it receives from U.S. customers to Samsung Networks and retains a 3 percent fee."

Samsung ECL is incorporated under the laws of Korea.  Samsung Networks alleges that although responsible for hosting and providing IT management services for the allegedly infringing website on the Korean server, Samsung ECL controls the content of the website.  To the extent that firmware containing Jscribe software was made available for download, Samsung Networks charges Samsung ECL with uploading the allegedly infringing material.

Plaintiff's Complaint alleges two counts against the Samsung Defendants, including a claim for copyright infringement and a claim for patent infringement. On November 2, 2009, Samsung Networks moved to dismiss Plaintiff's Complaint with respect to Counts I and VI for lack of personal jurisdiction.

B.    Facts Relevant to Arbitration

On December 11, 2007, CCP and Samsung ECL entered into a Software Remarketing Agreement ("SRA" or "Software Agreement") allowing Samsung ECL to grant secondary licenses to other Samsung entities, including subsidiaries, subcontractors and other affiliates or business partners of Samsung.  Samsung Electronics America, Inc. ("SEA") is a wholly owned subsidiary of Samsung ECL.  Pursuant to Section 15.5 of the SRA,

Both parties consent to the application of the laws of the [sic] Switzerland to govern,

3

interpret, and enforce all of the parties rights, duties, and obligations arising from, or relating in any manner to, the subject matter of this Agreement, without regard to conflict of law principles. The United Nations' Convention on the International Sale of Goods does not apply. Any and all disputes with respect to the interpretation of this agreement or other disputes between the parties arising under or in connection with this Agreement, which cannot be resolved by discussion between the parties, shall be finally settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules") by three arbitrator panel, one arbitrator appointed by each party, and the third arbitrator selected by the arbitrators selected by the parties or in accordance with the Rules. The Rules are deemed to be incorporated by reference into this agreement. The arbitration shall take place in Paris, France. The language of proceedings shall be in English. The right of each Party to obtain injunctive relief from the ordinary courts of law shall remain unaffected.

Further, pursuant to Section 3.5 of the SRA,

Except for the internal use license granted to SAMSUNG in this Section, SAMSUNG may perform this Agreement and any of its rights, licenses and obligations under this Agreement through / to the Samsung Electronics Corporation, its subsidiaries, subcontractors, and other companies affiliated with SAMSUNG such as SAMSUNG Business Partners. The use of subcontractors and other affiliated companies such as Business Partners, however, is subject to prior written consent of CCP. The use of such entities by SAMSUNG does not relieve it of its obligations under the Agreement. This Agreement does not grant SAMSUNG or any such entities any ownership to any copyright rights in the Products. SAMSUNG may assign this Agreement and any of its rights to the Samsung Electronics Corporation and CCP herewith agrees to this assignment.

SEA now seeks to exercise the arbitration clause pursuant to the Software Agreement. Accordingly, on November 2, 2009, SEA moved to dismiss Count III for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, to stay Count III pending arbitration.

## II.    LEGAL STANDARD

A.    Personal Jurisdiction

Pursuant to Fed. R. Civ. P. 4(e), a district court may exercise jurisdiction over a non-resident defendant to the extent permitted by the law of the state where the district court sits. See Fed. R.

Civ. P. 4(e). "A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004). "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." Id. (citing N.J. Ct. R. 4:4-4(c)). Pursuant to Fed. R. Civ. P. 12(b)(2), a plaintiff must demonstrate by a preponderance of the evidence facts sufficient to support the assertion of personal jurisdiction over a defendant. Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629, 632 (D.N.J. 2004) (citing Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992)). "A court must accept as true the allegations in the complaint and resolve disputed issues of fact in favor of the plaintiff[,]" for purposes of jurisdiction, plaintiff cannot rely on pleadings alone, but instead must provide actual proofs. Id. (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d 1984)). "Once the plaintiff has shown minimum contacts, the burden shifts to the defendant, who must show that the assertion of jurisdiction would be unreasonable." Id. (citing Mellon Bank (East) PFSF, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992)).

B.      Subject Matter Jurisdiction

"The [d]istrict [c]ourt, in deciding a motion under Fed. R. Civ. P. 12(b)(6), [is] required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[A court

5

is] not bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).   "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)." <u>Bell</u> at 555-56.

## III.   DISCUSSION

### A.   Personal Jurisdiction

Plaintiff contends that personal jurisdiction is proper because Defendant Samsung Networks has directed activities to the forum state and purposefully availed itself of the privilege of conducting business in the forum state.  Alternatively, Plaintiff contends that Defendant Samsung Networks's cable lines, providing network and telecommunication services throughout the United States, located in Piscataway, New Jersey approximate physical presence sufficient to confer general jurisdiction upon this Court. In the event that the Court is inclined to grant the motion to dismiss for lack of personal jurisdiction, alternatively, Plaintiff requests that this Court hold the motion in abeyance or deny the motion without prejudice pending jurisdictional discovery.

By contrast, Defendant argues that the allegations asserted against Samsung Networks do not arise from conduct purposefully directed at New Jersey, therefore, personal jurisdiction over this Defendant is lacking.  In support of this contention, Defendant asserts that although Samsung Networks operates as the host of the website, Samsung Networks does not control the content displayed on the website.  Further, Defendant Samsung Networks underscores the fact that it is not licensed to do business in New Jersey; has no office, mailing address or telephone listing in New Jersey; has no employees in New Jersey; pays no taxes in New Jersey; possesses no bank accounts

in New Jersey; has no loans from or extended credit to any individual or entity in New Jersey; does not advertise or market to New Jersey customers; and does not solicit customers in New Jersey.

"A court can assert either specific or general jurisdiction over a defendant. Specific jurisdiction requires the defendant to have minimum contacts with the forum state." Ameripay, 334 F. Supp. 2d at 633 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).  With respect to specific jurisdiction, "the lawsuit must 'arise out of' or 'relate to' these minimum contacts. Furthermore, the defendant must have purposefully availed itself of the forum such that it 'should reasonably anticipate being haled into court' there, having invoked the benefits and protections of the forum's laws." Id.  "General jurisdiction, by contrast, requires the defendant to have 'continuous and systematic' contacts with the forum state." Id. (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)).  "These contacts need not relate to the subject matter of the litigation."  Id. (citing Helicopteros, 466 U.S. at 415 n.9).  "However, general jurisdiction requires 'a very high threshold of business activity.'" Id. (citing Compagnie des Bauxites de Guinea v. Ins. Co. of N. America, 651 F.2d 877, 891 n.2 (3d Cir. 1981) (finding that a "daily presence" in the forum and activities such as weekly advertising, regular solicitation of business, substantial product sales, and the maintenance of a telephone number in the forum meet the threshold)).

"A website operated by the defendant may provide contacts sufficient to support jurisdiction."  Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629, 634 (D.N.J. 2004) (citing Toys "R" Us, Inc. v. Step Two, S.A, 318 F.3d 446, 452 (3d Cir. 2003)).  "If a website is neither 'passive,' i.e., solely informational, nor 'commercially interactive,' i.e., capable of executing contracts over the Internet, then jurisdiction depends on: (1) the level of interactivity; and (2) the

commercial nature of the exchange that occurs on the site." Id. "The likelihood that a state can exercise personal jurisdiction over a non-resident defendant website owner depends on 'the nature and quality of commercial activity that [the defendant] conducts over the Internet.'" Spuglio v. Cabaret Lounge, 2009 U.S. App. LEXIS 20398, at *4 (citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997); Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 453 (3d Cir. 2003)). "We examine that commercial activity to determine where it falls on what has come to be known as the *Zippo* sliding scale. On one end of the sliding scale are defendants who actively do business over the Internet. An example would be one who 'enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet.'" Id. (citing Zippo, 952 F. Supp. at 1124). "Personal jurisdiction based on a website is proper where [a] defendant uses the website to transact business." Gourmet Video, Inc. v. Alpha Blue Activities, Inc., 2008 U.S. Dist. LEXIS 87645, *16 (D.N.J. Oct. 29, 2008).

Undeniably, Defendant Samsung Networks purposefully directed its network and telecommunication services to the forum state. Accordingly, the first prong of the minimum contacts analysis is satisfied. The Defendant's service provides the medium through which the alleged infringing activity occurred, namely downloading the copyrighted material and patented software. However, when personal jurisdiction is premised upon a website, the second prong requires a more refined analysis, namely ascertaining the level of commercial activity engaged in by the Defendant through the website. In light of the allegation that Defendant Samsung Networks neither posted the links for downloading nor controlled the content of the website, it is not clear to the Court that Plaintiffs have established by a preponderance of the evidence minimum contacts sufficient to support the exercise of specific personal jurisdiction.

8

With respect to general jurisdiction, the presence of equipment alone may be sufficient to confer personal jurisdiction over the Defendant.  See Reynolds Publishers, Inc. v. Graphics Financial Group, Ltd., 938 F. Supp. 256 (D.N.J. 1996).  However, it is not clear to the Court that Plaintiff has demonstrated by a preponderance of the evidence continuous and systematic contact with the forum state sufficient to support the exercise of general jurisdiction in this matter.

"[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 336 (3d Cir. 2009) (citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 n.13 (1978)).  If "the plaintiff's claim is not clearly frivolous [as to the basis for personal jurisdiction], the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." Id. (citing Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 362 (3d Cir. 1983)).  The Third Circuit Court of Appeals has found "jurisdictional discovery particularly appropriate where the defendant is a corporation." Id.  Therefore, Plaintiff is permitted to conduct jurisdictional discovery concerning the issue of personal jurisdiction.  At this time, Defendant Samsung Network's motion to dismiss for lack of personal jurisdiction is **denied without prejudice** pending jurisdictional discovery.[2]

B.      Arbitration

Defendants move to dismiss or, in the alternative, compel arbitration and stay Count III of Plaintiff's Complaint.  Pursuant to the Federal Arbitration Act ("FAA"), Defendants argue that the

---

[2] Following the conclusion of jurisdictional discovery on the issue of personal jurisdiction, Defendant Samsung Networks will be permitted to refile this motion.  For purposes of compliance with the Federal Rules of Civil Procedure, the initial filing date is to be preserved for the purpose of refiling this motion following the conclusion of jurisdictional discovery.

arbitration provision of the Software Agreement between SEC and CCP requires arbitration, stating that "[a]ny and all disputes with respect to the interpretation of this agreement or other disputes between the parties arising under or in connection with this Agreement, which cannot be resolved by discussion of the parties, shall be finally settled by arbitration." Pursuant Section 3.5 outlined above, Defendants contend that Plaintiffs agreed to arbitrate disputes with SEC or its subsidiaries. Moreover, Defendants contend that Swiss law permits a non-signatory to enforce an arbitration clause based on ordinary contract principles.

By contrast, Plaintiffs contend that, in lieu of the FAA, the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") applies in the instant matter. Further, Plaintiffs assert that a choice-of-law provision in the Software Agreement requires the application of Swiss law and as a consequence, precludes a non-signatory from invoking an arbitration provision pursuant to the Software Agreement.

"The Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*, ("FAA") creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." Century Indem. Co. v. Certain Underwriters at Lloyd's, 584 F.3d 513, 522 (3d Cir. 2009) (citing Harris v. Green Tree Fin. Corp., 183 F.3d 173, 176 (3d Cir. 1999)). "Before compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." Id. at 523. "The FAA's second chapter, 9 U.S.C. §§ 201-208, implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, opened for signature June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, reprinted in 9 U.S.C. § 201 (historical and statutory notes)." Id.; See Scherk v. Alberto-Culver Co., 417 U.S. 506, 507 (1974); Standard Bent Glass Corp. v. Glassrobots Oy, 333

10

F.3d 440, 448-49 (3d Cir. 2003).  "Pursuant to this chapter, arbitration agreements fall within the New York Convention if they arise from commercial, legal relationships, such as commercial contracts, except when those relationships are entirely between United States citizens and otherwise are domestic in nature." Id. (citing 9 U.S.C. § 202).  Although "[a]ctions under the New York Convention are deemed to arise under the laws and treaties of the United States[,]" the "domestic FAA applies to actions brought under the New York Convention [only] to the extent that the two are not in conflict." Id. (citing 9 U.S.C. § 208).

"Article II of the Convention [ ]  dictates when a court should compel parties to an arbitration." China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 284 (3d Cir. 2003).  Pursuant to Article II of the New York Convention:

> 1.      Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> 2.      The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.
>
> 3.      The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Therefore, an arbitration agreement falls within the New York Convention when the agreement (1) is an agreement in writing to arbitrate the subject of a dispute, (2) provides for arbitration in the territory of a signatory to the Convention, (3) arises out of a legal relationship, contractual or not, that is considered commercial, and (4) is a legal relationship between parties at least one of which

is not an American citizen, or at least is a legal relationship bearing some reasonable relation with one or more foreign states. Century, 584 F.3d at 523 (citing Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. II).

"In general, we respect the choice of law that parties agree upon to resolve their private disputes." GE v. Deutz AG, 270 F.3d 144, 155 (3d Cir. 2001); see Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 164 (3d Cir. 1999).  In the instant matter, both parties agree that the Software Agreement contains a choice-of-law provision requiring the application of Swiss law.  The Second Circuit Court of Appeals acknowledges the interest of uniformity in the interpretation of arbitration agreements in accordance with the FAA where parties have not selected the applicable governing law.  At the same time,

> where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention. Furthermore, respecting the parties' choice of law is fully consistent with the purposes of the FAA. . . In short, if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the Swiss choice-of-law clauses that govern those agreements.

Motorola Credit Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004), cert. denied, 544 U.S. 1044 (2005).

Therefore, in the instant matter, Swiss law governs the issue concerning whether a non-signatory to the Software Agreement, Defendant Samsung America, is permitted to invoke the arbitration clause.[3]  An absence of Third Circuit precedent exists concerning the application of Swiss

---

[3]

In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law. Fed. R. Civ. P. 44.1.

law to an arbitration clause in a transnational agreement.  Indeed, the parties recognize an absence of Swiss law concerning the direct and narrow issue of whether a non-signatory can invoke an arbitration clause against a signatory.

>    1.    Second Circuit Application

According to the Second Circuit Court of Appeals, with respect to the issue of arbitrability, the Swiss Federal Tribunal (the highest court in Switzerland) adheres to the following:

> In principle an arbitration clause is binding only on those parties which have entered into a contractual agreement to submit to arbitration, whether directly or indirectly through their representatives. Exceptions to this rule arise in cases of legal succession, retroactive approval of an arbitration clause or attempts to pierce the corporate veil of a legal entity in the case of abusive objections to the clause.

Motorola, 388 F.3d at 52 (citing Swiss Federal Tribunal, decision of May 19, 2003, 4C. 40/2003, No. 4.1).  In the Motorola case, plaintiffs' experts represented that "there is no Swiss authority where a Non-Signatory has even tried to compel/invoke arbitration against a Signatory . . . ." Id. Ultimately, the Court concluded that the "District Court correctly held that defendants, who were not parties to any agreement to arbitrate with plaintiffs, could not compel plaintiffs to arbitrate." Id. at 49. Notably, two arguments advocating the invocation of the arbitration clause were presented on appeal: (1) estoppel and (2) a party who signs an arbitration agreement with a corporation is also bound to arbitrate with that corporation's agents.  The latter argument was never addressed and in fact, summarily dismissed as a consequence of the failure to raise the argument before the district court below.  Id.  At least one secondary source has interpreted the Motorola case as precluding nonsignatories from invoking an arbitration clause.  Johnathan M. Strang, *NOTE: The Chicken Comes First: Who Decides If an Arbitrator has Jurisdiction to Arbitrate?*, 16 Fed. Cir. B.J. 191, 208 (2007).

However, relevant Swiss authority, translated into English, submitted to this Court demonstrates that Swiss law may adhere to more expansive view.

### 2.    Translations of Relevant Swiss Authority

In accordance with Article 178 of Switzerland's Federal Private International Law Act ("PILA") of December 18, 1987, an arbitration agreement "must be made in writing, by telegram, telex, telecopter or any other means of communication which permits it to be evidenced by a text." "Furthermore, an arbitration agreement is valid if it conforms either to the law chosen by the parties, or to the law governing the subject-matter of the dispute, in particular the main contract, or to Swiss law." Finally, "[t]he arbitration agreement cannot be contested on the grounds that the main contract is not valid or that the arbitration concerns a dispute which had not as yet arisen."

In the <u>X.S.A. and A. v. Y.A.G.</u> decision of May 19, 2003, the Swiss Federal Supreme Court recognizes that where "there is a concrete arbitration clause in place, there is no reason to make a particularly restrictive interpretation; in fact in such a case it must be assumed that if the parties entered into an arbitration agreement, they wanted the arbitral tribunal to have comprehensive jurisdiction."[4] (Plaintiff's Exhibit ("P. Ex.") B). "The applicable principle is that of trust, according to which the presumed intention of the parties is to be ascertained through interpretation of their declarations of intent as they may have been and must have been understood according to their wording and context as well as the circumstances as a whole."(P. Ex. B). In this case, the Swiss Federal Supreme Court reiterates the general principle[5] adopted by the Second Circuit above. (P. Ex.

---

[4]

Internal citations to Swiss authority have been omitted.

[5]

"It is true that in principle an arbitration clause is binding only on those parties which have entered into a contractual agreement to submit to arbitration, whether directly or indirectly through their representatives.  Exceptions to this rule

14

B).  Further, the Court recognizes "on the one hand, an arbitration agreement can also be binding on persons who have not signed it." (P. Ex. B). "On the other, it is not binding on those who sign it merely on behalf of a third party." (P. Ex. B).  With respect to that matter, ultimately the Court concluded, "it is not possible to infer from the appealed order nor to see otherwise that [Plaintiff 1] signed in his own name, too.  In principle, therefore, the Defendant cannot rely upon the arbitration clause against him." (P. Ex. B).

According to the  X. Ltd v. Y. and Z. S.p.A. decision of August 19, 2008 (4A.128/2008), "in a certain number of cases, such as the transfer of loans, the assumption (simple or cumulative) of debt or the transfer of a contractual relationship, the Federal Supreme Court of Switzerland has long admitted that an arbitration agreement can obligate even persons who did not sign it and are not mentioned therein." (P. Ex. F). "Furthermore, third parties that participate in the performance of the contract containing the arbitration agreement are considered to have joined it, by conclusive actions, if its intention to be a party to the arbitration agreement can be inferred from this participation" (P. Ex. F).  In this case, the Court concluded that "[f]or its jurisdiction to be recognized, the guarantee contract has to contain an arbitration clause specifically providing for it, or it must contain a sufficient referral to the arbitration clause in the principal contract (arbitration agreement by reference), or even, failing this, that the guarantor has declared, either expressly or by conclusive attitude an intention that the creditor could interpret in good faith, according to the principle of

---

arise in cases of legal succession, retroactive approval of an arbitration clause or attempts to pierce the corporate veil of a legal entity in the case of abusive objections to the clause (cf. Poudret/Basson, op. cit., marg. 260; Wenger, *Basler Kommentar*, n.63 et seqq. ad Art. 178 PILA; Schwab/Walter, *Schiedsgerichtsbarkeit, Kommentaar*, 6th Edn., Munich 2000, p. 70 et. seqq. 471; on singular succession, cf. unpublished ruling 4P.126/2001 dated 18 December 2001, consid. 2e/bb).  For the parties' own protection, Swiss law stipulates that the agreement is not valid unless it is made in writing or by any other means of communication which permits it to be evidenced by a text (Art. 178 para. 1 PILS; cf. Wenger, op. cit., n.7 ad Art. 178 PILS).

confidence, as being an intention to submit to the arbitration agreement inserted in the principal contract." (P. Ex. F).

In the <u>LUKoil-Permnefteorgsintez. LLC v. the interim award rendered on April 2, 2001, et. al.</u> decision of December 18, 2001(4P. 126/2001, 1st Civil Court), the Swiss Court reaffirms that "Art. 178(1) of the PILA accepts arbitral clauses by reference and does not require that the existence of arbitral clause in the document to which the reference is made to be mentioned in the 'text' making the reference [ ]." ( Defendant's Exhibit ("D. Ex.") C).  In determining the applicability of an arbitration clause, the Court indicates that "[o]ne must ascertain the true intent of the parties, or in the absence of such an intent, to resort to the principle of good faith [*sometimes referred to as 'principle of trust' or 'of confidence' in other translations*], which also applies when it comes to deciding upon disputes regarding either the consent that is required for an arbitration agreement to be formed, or the interpretation of such an agreement."[6]  (D. Ex. C). "Swiss law considers that in the case of the assumption of an obligation, as well as in the case of the assignment of a claim or the assumption of a contractual relation [ ], the arbitration clause is in principle transferred to the assignee, unless stipulated otherwise. If one accepts the adhesion by reference, or the incorporation by reference of an arbitration clause contained in general conditions, standard forms or standard contracts, a fortiori one also has to accept adhesion in case of reference to a determined contract of

---

[6] "[I]f the real intent of the parties cannot be established, the Supreme Court can freely decide the substantive issue of the way a declaration should have been understood by its recipient, according to the principle of good faith.  The content of the declaration and the circumstances, which are points in fact, are the bases to decide the legal issue.  According to the principle of good faith, someone who makes a declaration of intent to someone else is bound by his declaration with the meaning that the addressee can and should give it in good faith, in view of all the circumstances.  Whether the author of the declaration may not have realized the scope of what he was saying does not matter, as long as the addressee could not notice it (ATF 126 III 375, part. 2.3/aa of the reasons, at 378 and the decisions cited there).  Interpretation according to the principle of good faith is that of a loyal and reasonable person (ATF 116 II 431, part 3.1 of the reasons)."

which one of the parties has assumed important obligations." (D. Ex. C).

In the X. S.A.L., Y. S.A.L. and A vs. Z Sarl and ICC arbitral tribunal decision of April 19, 1994, the Swiss Court recognizes that it would be "contrary to the rules of good faith, which govern international commercial relationships, that an individual who has immixed [sic] himself, in a persistent and repeated manner, in the performance of a contract, would be allowed, when the time comes, to hide behind the corporation(s) which have signed the contract, and to contest being bound by the provisions of such contract, in particular by the arbitration clause." (D. Ex. D).  "Similarly, in several cases, such as the assignment of a claim, the (simple or cumulative) assumption of a debt or the transfer of a contractual relationship, the Supreme Court has long considered that an arbitration agreement can be binding even for persons who have not signed it and who are not mentioned in it." (D. Ex. D).  "The liberalism which characterizes federal case law concerning the form of the arbitration agreement in international arbitration is also revealed in the flexibility with which case law deals with the issue of the arbitration clause by reference." (D. Ex. D).  "It appears even more clearly in two recent decisions where it was held that through a simple procedural step, a party had given its assent to an arbitration clause." (D. Ex. D).  "In addition, depending on the circumstances, conduct can make up for the inobservation [sic] of a formal prescription, according to the principles of good faith."  (D. Ex. D). "Ultimately and in line with this liberal case law, too strict requirements should not be set regarding the formal validity of the extensions of an arbitration clause to a third party." (D. Ex. D).

According to the A.    v. B.    , Ltd. decision of December 5, 2008 (4A_376/2008, 1st Civil Court), an "arbitration clause must be interpreted according to Swiss rules relating to the interpretation of contracts." (D. Ex. E).  "The contents of a contract are determined primarily through

subjective interpretation, namely by seeking the true and reciprocal intent of the parties, instead of relying on the inaccurate denominations or words they may use, mistakenly or in order to disguise the true nature of the contract." (D. Ex. E).  "Whenever, as in the case at hand, there are no factual certainties as to the real and reciprocal intent of the parties or when the court finds that one party did not understand the other's intent their (presumed) intent must be determined interpreting their statements according to the principle of trust (so called objective interpretation), namely with the meaning that each contractive party could and should reasonably attribute to the statements of intent of the other under the specific circumstances." (D. Ex. E).  "Not only the text and the context of the statements must be considered for that purpose, but also the circumstances which preceded or accompanied the stipulation of the contact, but not the behaviour [sic] subsequently adopted by the parties." (D. Ex. E).  "Finally, it must be recalled that the principle of trust allows the attribution to a party of the objective meaning of its statement or its behaviour [sic], even though this may not correspond to its intimate will." (D. Ex. E).

"Swiss case law- the law applicable in this case - already recognised [sic] the possibility to extend the arbitration clause to persons who did not sign it, although written form is one of the requirements for the validity of the clause stated at Art. 178 PILA.  This may be the case when a claim is assigned, taken over or when a contractual relationship is transferred.  It has already been admitted that in specific circumstances, a certain behaviour may substitute compliance with a formal requirement on the basis of the rules of good faith.  For instance, when a third party becomes involved in the performance of the contract which contains the arbitration clause in such a way that an intent to submit to the arbitration agreement, expressed by its behaviour, may be deduced from its behaviour." [sic] (D. Ex. E).

18

In the A. v. B.   decision of December 25, 2009 (4A_160/2009, 1ˢᵗ Civil Court), the Swiss Court addresses the application of an arbitration provision incorporated by reference.  "Under Paragraph 23 of the standard MFIFA [(Member Firm Interfirm Agreement)], each Member Firm recognizes that the rights and obligations flowing from the MFIFA which it has signed and from the other MFIFAs entered into or to be entered into by AWSC which run to the benefit or burden of other Member Firms, can be enforced by or against the latter, as the case may be." As amended, Paragraph 22.1 provided, "Subject to the exercise by Anderson, S.C. of its option under Paragraph 9.5 hereof, any and all disputes which cannot be settled amicably, . . .shall be finally settled by arbitration conducted by a single arbitrator in Geneva, Switzerland." (D. Ex. F.). At issue was whether firms who signed MFIFAs not containing the ICC clause were nevertheless bound by the ICC clause.(D. Ex. F).   The Court concluded that "[t]he arbitration agreement contained in the standard agreement, which was inserted or to be inserted in the individual contracts, relates to any dispute in connection with the MFIFAs and concerns any party. . . Finally, the multiparty character of the arbitration agreement results from Paragraph 23, which expressly confers to all Member Firms the right to avail themselves of rights and obligations created by the MFIFAs against the other Member Firms." (D. Ex. F).

Notably, as previously indicated, the issue presented to this Court contemplates the inverse of the principle espoused by Swiss law.  While Swiss authority promulgates rules concerning the invocation of an arbitration clause by a signatory to an agreement against a nonsignatory, the invocation of an arbitration clause by a non-signatory against a signatory appears to be an unprecedented issue in Swiss case law.

To reiterate Section 3.5 of the SRA explicitly confers upon Samsung the right to "perform

19

this Agreement and any of its rights, licenses and obligations under this Agreement through / to the Samsung Electronics Corporation, its subsidiaries, subcontractors, and other companies affiliated with SAMSUNG such as SAMSUNG Business Partners."[7] Despite the general preclusion recognized by the Second Circuit, preventing nonsignatories from invoking arbitration clauses against signatories, the instant matter is unique and distinguishable.  The foregoing provision in the contract incorporates by reference nonsignatories.  Notably, the nonsignatory at issue is a wholly owned subsidiary of the signatory to the contract.   Indeed, that provision not only fails to reserve any rights as exclusive to the signatory, but also explicitly confers upon a nonsignatory, including a wholly owned subsidiary of the signatory, the right to exercise and enforce any provision in the contract.

In the presence of a concrete arbitration clause, Swiss law advocates a broad interpretation in the application of an arbitration clause and directs this Court's attention to the declaration and intent of the parties.  Beyond evidencing an intention to be bound by the terms of the agreement where an entity incorporated by reference into the agreement seeks to enforce the rights of the SRA, the foregoing provision constitutes an express acquiescence by Plaintiff.

Indeed, Swiss law appears to contemplate the application of an arbitration provision in circumstances beyond the scope of exceptions memorialized in the Second Circuit Motorola opinion. That is, Swiss law appears to recognize exceptions to the general prohibition concerning the invocation of an arbitration clause against a nonsignatory including not only legal succession, retroactive approval of an arbitration clause and corporate veil piercing, but also the transfer of a contractual relationship and even the mere participation in the performance of a contract by

---

[7]

The Motorola case does not appear to have involved a provision incorporating by reference subsidiaries, and other nonsignatory entities, and extending rights contained in the contract to those entities.

conclusive actions or repeated and persistent performance.

Ultimately, Swiss law neither addresses the invocation of an arbitration clause by a nonsignatory against a signatory nor forecloses such an application. In light of the explicit incorporation by reference of a nonsignatory wholly owned subsidiary in the SRA, the broad interpretation afforded to a comprehensive arbitration provision and the exceptional circumstances articulated by Swiss law permitting a signatory to invoke an arbitration clause against a nonsignatory, this Court cannot assert a blanket prohibition of the invocation of an arbitration clause by a nonsignatory against a signatory. Therefore, the Court declines to divest entities of rights that are explicitly conferred upon them by contractual provision in the SRA, namely Section 3.5. At the same time, the Court is not proposing that under any circumstance a nonsignatory is permitted to exercise an arbitration clause against a signatory. The circumstances in the present matter are unique. This Court's review of Swiss authority suggests that Swiss law would recognize the invocation of an arbitration clause by a nonsignatory, but wholly owned subsidiary of a signatory, where the nonsignatory is incorporated by reference into the contract and where the contract explicitly contemplates the exercise and assertion of rights pursuant to that agreement by an entity other than a signatory to the agreement. Therefore, Defendant's motion is **granted in part** and Count III of Plaintiff's Complaint is stayed pending the conclusion of arbitration.

IV.   CONCLUSION

For the foregoing reasons, Defendant Samsung Network's motion to dismiss Counts I and VI for lack of personal jurisdiction is **denied without prejudice** pending jurisdictional discovery and Defendant SEA's motion to dismiss or, in the alternative, to stay Count III pending arbitration

is **granted in part**, and Count III is stayed pending the conclusion of arbitral proceedings**.**   An

appropriate Order accompanies this Opinion.


                                                          S/ Dennis M. Cavanaugh
Dated:        June  21 , 2010                        Dennis M. Cavanaugh, U.S.D.J.
cc:           All Counsel of Record
              Hon. Claire C. Cecchi, U.S.M.J.
              File